ACCEPTED
03-14-00375-CV
6136719
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/20/2015 1:44:46 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00375-CV

# In the
# Third Court of Appeals
# Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/20/2015 1:44:46 PM
JEFFREY D. KYLE
Clerk

————————

AUSPRO ENTERPRISES, LP,

*Appellant*,

v.

TEXAS DEPARTMENT OF TRANSPORTATION,

*Appellee*.

————————

On Appeal from the 345th Judicial District Court of
Travis County, Texas

————————

**APPELLANT AUSPRO ENTERPRISES, LP'S SUPPLEMENTAL BRIEF ON
*REED V. TOWN OF GILBERT* & APPENDIX**

————————

Meredith B. Parenti
State Bar No. 00797202
PARENTI LAW PLLC
7500 San Felipe, Suite 600
Houston, Texas 77063
[Tel] (281) 224-5848
[Fax] (281) 605-5677
meredith@parentilaw.com
*Counsel for Appellant*
*AusPro Enterprises, LP*

**ORAL ARGUMENT REQUESTED**

The following is a complete list of the parties, attorneys, and any other person who has any interest in the outcome of this appeal.

**Defandant/Appellant:**

AusPro Enterprises, LP

**Counsel for Defendant/Appellant:**

Meredith B. Parenti
State Bar No. 00797202
PARENTI LAW PLLC
7500 San Felipe, Suite 600
Houston, Texas 77063
[Tel] (281) 224-5848
[Fax] (281) 605-5677
meredith@parentilaw.com

**Plaintiff/Appellee:**

Texas Department of Transportation

**Counsel for Plaintiff/Appellee:**

Douglas Geyser
Assistant Solicitor General
Matthew Bohuslav
Assistant Attorney General, Transportation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
[Tel] (512) 936-2540
[Fax] (512) 472-3855
douglas.geyser@texasattorneygeneral.gov
matthew.bohuslav@texasattorneygeneral.gov

**SUPPLEMENTAL STATEMENT REGARDING ORAL ARGUMENT**

Although the Supreme Court's decision in *Reed v. Town of Gilbert* undoubtedly controls this case and requires reversal of the trial court's judgment, oral argument may benefit the Court by permitting counsel to address *Reed*'s application to the facts of this case and to answer any questions the Court may have about the record and the extent to which the Texas Highway Beautification Act and its implementing regulations can survive a holding that they impermissibly regulate the content of speech.

Identity of Parties and Counsel ................................................................. i

Supplemental Statement Regarding Oral Argument .................................... ii

Table of Authorities ................................................................................. iv

Background on *Reed v. Town of Gilbert* ..................................................... 1

Argument ................................................................................................... 6

I.   The Election Sign Exemption Is a Content-Based Regulation of Speech ........ 7

    A.   The Act and Its Implementing Regulations Are Not Subject to Intermediate Scrutiny as Time, Place, and Manner Restrictions ........... 9

    B.   The State Cannot Justify the Statute on the Grounds That It Is Aimed at the Secondary Effects of Signs ........................................... 11

    C.   TxDOT Cannot Satisfy Its Burden to Show That the Election Sign Exemption Is Narrowly Tailored to Further a Compelling Governmental Interest ................................................................. 11

II.  The Court Should Invalidate Both the Act and Its Implementing Regulations ........................................................................................... 16

III. The Texas Constitution Also Forbids the State's Regulation of Election Signs ............................................................................................... 19

Prayer ..................................................................................................... 20

Appendix

# TABLE OF AUTHORITIES

**Cases**

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ................................................................... 17

*Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) .................................................................. 5

*Citizens United v. Federal Election Commission*,
  130 S.Ct. 876 (2010) ................................................................ 12

*City of Painesville Building Dep't v. Dworken & Bernstein Co., L.P.A.*,
  89 Ohio St.3d 564 (2000) ........................................................ 15

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986) ................................................................... 10

*Curry v. Prince George's County*,
  33 F.Supp.2d 447 (D. Md. 1999)............................................. 15

*FW/PBS, Inc. v. Dallas*,
  493 U.S. 215 (1990) ................................................................. 17

*Freedman v. Maryland*,
  380 U.S. 51 (1965) .............................................................. 16-17

*Knoeffler v. Town of Mamakating*,
  87 F.Supp.2d 322 (S.D.N.Y. 2000) ........................................ 15

*Police Dep't of Chicago v. Mosley*,
  408 U.S. 92 (1972) ................................................................... 3

*Reed v. Town of Gilbert*,
  576 U.S. __, 135 S.Ct. 2218 (2015) ................................ *passim*

*Shuttlesworth v. Birmingham*,
  394 U.S. 147 (1969) ................................................................. 17

*Sorrell v. IMS Health, Inc.*,
    564 U.S. ___, 131 S.Ct. 2653 (2011) .................................................................. 3

*Texas Department of Transportation v. Barber*,
    111 S.W.3d 86 (Tex. 2003) ........................................................................... 9-11

*Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*,
    467 S.E.2d 875 (Ga. 1996) ........................................................................... 13, 14

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) .......................................................................................... 11

*Ward v. Rock Against Racism*,
    491 U. S. 781 (1989) ..................................................................................... 4, 10

*Whitton v. City of Gladstone*,
    54 F.3d 1400 (8th Cir. 1995) ................................................................. 13, 14, 15

**Statutes, Regulations, & Constitutional Provisions**

43 TEX. ADMIN. CODE §§21.141–.260 ....................................................................... 18

43 TEX. ADMIN. CODE §21.146(a)(10) ................................................................... 8, 16

TEX. TRANSP. CODE §391.002(b)(1), (2) ................................................................. 12

TEX. TRANSP. CODE §391.005 ......................................................................... *passim*

TEX. TRANSP. CODE §391.031(a)(1) ........................................................................... 7

TEX. TRANSP. CODE §391.031(b)(1), (2), (3), (5) ..................................................... 14

TEX. TRANSP. CODE §391.037 .................................................................................. 14

TEX. TRANSP. CODE §391.099 .................................................................................. 14

TEX. CONST. art. I, §8 ............................................................................................... 19

TEX. CONST. art. I, §29 ............................................................................................. 19

U.S. CONST. amend. I ................................................................................................ 10

To the Honorable Third Court of Appeals:

After the parties filed their opening briefs in this case, Appellant AusPro Enterprises, LP moved to stay this appeal pending the decision by the Supreme Court of the United States in *Reed v. Town of Gilbert*, No. 13-502. AusPro also requested supplemental briefing under TEX. R. APP. P. 38.7 to address the decision in *Reed*. The Court granted the motion in part and stayed the case, permitting the parties to file supplemental briefs to address *Reed*. Now that the Supreme Court has issued its decision in *Reed*, Appellant respectfully submits that the decision controls this case, and requires this Court to reverse the trial court's judgment and hold that the Texas Highway Beautification Act and its implementing regulations, like the sign code held unconstitutional in *Reed*, are "content-based regulations of speech that cannot survive strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. __, 135 S.Ct. 2218, slip op. at 1 (2015); App. 1.

## BACKGROUND ON *REED V. TOWN OF GILBERT*

Petitioners in *Reed*, a pastor and his church, challenged a Gilbert, Arizona sign code involving durational and other limitations on various categories of signs, including political, ideological, and temporary directional signs, based on the subject matter of the signs. App. 1 at 1-3. The sign code treated ideological signs most favorably, allowing them to be up to 20 square feet in area and placed in all zoning areas without time limits. *Id.* at 2.

1

Political signs, defined as any "temporary sign designed to influence the outcome of an election called by a public body," were treated less favorably than ideological signs, with a maximum size of 16 square feet on residential property and 32 square feet on nonresidential property, undeveloped municipal property, and rights of way. *Id.* Political signs could be displayed up to 60 days before a primary election and up to 15 days after a general election. *Id.*

Temporary directional signs intended to direct pedestrians, motorists, and passersby to qualifying events such as assemblies and meetings, were treated even less favorably by the code, with a maximum size of six square feet and a durational limitation on their placement, either on private property or a right of way, of no more than 12 hours before the event and 1 hour afterward. *Id.* at 3.

Petitioners advertised the time and place of their Sunday church services, which were held in a variety of locations, with signs posted early in the day on Saturday and removed around midday on Sunday. *Id.* at 3-4. After the town cited the church for violating the sign code's time limits, petitioners challenged the sign code under the First and Fourteenth Amendments. *Id.* at 4. The district court denied preliminary injunctive relief, and the Ninth Circuit affirmed, holding the sign code was content-neutral. *Id.* On remand, the district court granted summary judgment for the town, and the court of appeals again affirmed. *Id.* at 5.

The question presented in *Reed* was:

Does Gilbert's mere assertion of a lack of discriminatory motive render its facially content-based sign code content neutral and justify the code's differential treatment of Petitioners' religious signs?

Brief for Petitioners, *Reed v. Town of Gilbert*, No. 13-502 (Sept. 15, 2014).

The Supreme Court reversed, holding that the sign code's restrictions were "content-based regulations of speech that cannot survive strict scrutiny." App. 1 at 1.

The Court's analysis began with the fundamental principle that, under the First Amendment, applicable to the states and municipalities through the Fourteenth Amendment, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* at 6 (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Addressing what it means for a regulation of speech to be "content based," the Court gave the phrase the "commonsense" meaning that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. ___, ___–___, 131 S.Ct. 2653, slip op. at 8-9 (2011)). Under the Court's definition, a court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* While some distinctions "are obvious, defining regulated speech by particular subject matter, . . . others are more subtle, defining regulated speech by its function or purpose." *Id.* Regardless,

3

"[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* The Court also identified a separate category of laws that, "though facially content neutral, will be considered content-based regulations of speech: laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 6-7 (quoting *Ward v. Rock Against Racism*, 491 U. S. 781, 791 (1989)).

The Court held that the Gilbert sign code was "content based on its face" because it defined temporary directional signs "on the basis of whether a sign convey[ed] the message of directing the public to church or some other 'qualifying event.'" *Id.* at 7. Moreover, the code defined political signs "on the basis of whether a sign's message was 'designed to influence the outcome of an election,'" and ideological signs on the basis of whether a sign "'communicat[ed] a message or ideas' that d[id] not fit within the Code's other categories." *Id.* Thus, the sign code's restrictions "depend[ed] entirely on the communicative content of the sign." *Id.*

Because the sign code was a content-based regulation of speech, the Court refused to consider the government's justifications or purposes for enacting the code in determining whether strict scrutiny applied. *Id.* The Court rejected several arguments as to why the code should be deemed content neutral. Significantly, the

4

court of appeals had determined that the town did not adopt its regulation based on disagreement with the message conveyed, and its justifications for the regulation were unrelated to the content of the sign. *Id.* at 8. The Court flatly rejected this logic:

> But this analysis skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face. A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech.

*Id.* (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U. S. 410, 429 (1993)). Thus, "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* at 9.

The Court also rejected the court of appeals's reasoning that the sign code was neutral because it did not single out any idea or viewpoint for disparate treatment. *Id.* at 11. The Court explained that this argument "conflates two distinct but related limitations" on regulations of speech—discrimination among viewpoints, which is "more blatant" content discrimination, and prohibitions on entire topics of discussion. *Id.* at 11-12. "Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 12.

Because the sign code was content based, the Court applied strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling

5

interest and is narrowly tailored to achieve that interest." *Id.* at 14 (citations and internal quotations omitted). Thus, it was "the Town's burden to demonstrate that the Code's differentiation between temporary directional signs and other types of signs, such as political signs and ideological signs, furthers a compelling governmental interest and is narrowly tailored to that end." *Id.* at 14-15.

The Court held that the town could not demonstrate that the sign code was narrowly tailored to further a compelling governmental interest. *Id.* at 14-15. The Court concluded that the two proffered governmental interests—aesthetics and traffic safety—were "hopelessly underinclusive" because the code allowed unlimited, larger ideological signs while strictly limiting smaller, directional signs. *Id.* at 15. Nor did directional signs pose a greater traffic hazard than ideological or political signs. *Id.* "The signs at issue in this case, including political and ideological signs and signs for events, are far removed from those purposes [of traffic safety]. . . . [T]hey are facially content based and are neither justified by traditional safety concerns nor narrowly tailored." *Id.* at 17. Thus, the Court held that the sign code "fail[ed] strict scrutiny." *Id.* at 15.

## ARGUMENT

### I. THE ELECTION SIGN EXEMPTION IS A CONTENT-BASED REGULATION OF SPEECH.

After *Reed*, there is no doubt that a restriction on the display of election signs is, by definition, a content-based regulation of speech that is subject to strict scrutiny. *Reed* held that a town sign code that distinguished between signs based on whether they were ideological, political, or directional was "content based on its face." App. 1 at 7. So, too, are Texas's Highway Beautification Act and its implementing regulations.

The Texas Highway Beautification Act generally prohibits outdoor advertising within 660 feet of the right of way of interstate or primary state highways. TEX. TRANSP. CODE §391.031(a)(1); App. J; AusPro Br. at 14-15.[1] The election sign exemption challenged by AusPro provides that:

> This chapter does not apply to a sign *erected solely for and relating to a public election* if the sign:
>
> (1) is on private property;
>
> (2) is erected not earlier than the 90th day before the date of the election and is removed not later than the 10th day after the election date;
>
> (3) is constructed of lightweight material; and
>
> (4) has a surface area not larger than 50 square feet.

---

[1] Citations to the lettered portions of the Appendix (App. A–Z) refer to the Appendix filed with Appellant's opening brief.

TEX. TRANSP. CODE §391.005 (emphasis added); App. D; *see also* 43 TEX. ADMIN. CODE §21.146(a)(10); App. E.

By singling out speech "erected solely for and relating to a public election" for disparate treatment in TEX. TRANSP. CODE §391.005, the election sign exemption constitutes the type of "obvious" content-based regulation of speech the Supreme Court in *Reed* held is subject to strict scrutiny. App. 1 at 6. Like the sign code in *Reed*, the Act and its implementing regulations distinguish between signs based on their content. The code invalidated in *Reed* defined political signs "on the basis of whether a sign's message is 'designed to influence the outcome of an election.'" App. 1 at 7. The Texas election sign exemption similarly applies to signs "erected solely for and relating to a public election." TEX. TRANSP. CODE §391.005; App. D. Both restrictions "depend entirely on the communicative content of the sign." App. 1 at 7. Both restrictions are obvious content-based restrictions on speech.

As discussed below, the Court in *Reed* rejected every major argument proffered by TxDOT to justify the Act and its implementing regulations. After *Reed*, there is simply no basis to apply intermediate scrutiny to the Act and its regulations. Instead, the Act and its regulations are subject to strict scrutiny, which they cannot withstand.

8

**A.** **The Act and Its Implementing Regulations Are Not Subject to Intermediate Scrutiny as Time, Place, and Manner Restrictions.**

Relying on the Supreme Court of Texas's decision in *Texas Department of Transportation v. Barber*, 111 S.W.3d 86 (Tex. 2003), TxDOT argues that the Act is content neutral and that it may be justified as a time, place, and manner restriction subject to intermediate scrutiny. TxDOT Br. at 11-16. This analysis cannot stand after *Reed*, however, because the election sign exemption is undoubtedly content based. On its face, the election sign exemption regulates the duration of election signs based on their content. If the sign relates to an election, the Act strictly limits the speech to a limited window of 90 days prior to, and ten days after, an election. The Act prohibits speech relating to elections along interstate and primary highways at all other times of the year.

The Texas Supreme Court in *Barber* held that the Act's general prohibition on signs along state highways and interstates was a content-neutral time, place, and manner restriction as applied to Barber's billboard. 111 S.W.3d at 89. The election sign exemption was not directly before the Court given that Barber had only challenged the Act as applied to his sign, which was unrelated to any election. *Id.* at 100. Regardless, the Court recognized that the Act "does make certain distinctions based on subject matter," such as the exemptions for directional signs, signs relating to natural wonders or scenic or historic attractions, and election signs. *Id.* at 98. Nevertheless, the Court held the Act was "content neutral because

9

it is '*justified* without reference to the content of the regulated speech.'" *Id.* at 100 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (adding emphasis)). Moreover, the Court held that although the "election sign exemption is arguably content based, . . . '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.* (quoting *Ward*, 491 U.S. at 791).

The reasoning in *Barber* is no longer good law. Under *Reed*, the justification and purposes of the regulation are irrelevant to the threshold question of whether it is content based. App. 1 at 9 ("[W]e have repeatedly considered whether a law is content neutral on its face *before* turning to the law's justification or purpose."). Instead, the Court must first ask whether the regulation "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 6. As the Supreme Court recognized in *Reed*, "[i]nnocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—i.e., the 'abridg[ement] of speech'—rather than merely the motives of those who enacted them." App. 1 at 10 (quoting U.S. CONST. amend. I).

Because the Act and its regulation make "certain distinctions based on subject matter," as the Texas Supreme Court recognized in *Barber*, 111 S.W.3d at

98, it is content based and subject to strict scrutiny. The sign code invalidated in *Reed* similarly was content based because it "identifie[d] various categories of signs based on the type of information they convey, then subject[ed] each category to different restrictions." App. 1 at 1. TxDOT's justification that the Act and regulations are reasonable time, place, and manner restrictions falls by the wayside, and the regulations must satisfy strict scrutiny.

**B.      The State Cannot Justify the Statute on the Grounds That It Is Aimed at the Secondary Effects of Signs.**

As established in AusPro's opening brief, TxDOT cannot justify the Act and its regulations on the grounds that they are aimed at the "secondary effects of billboards and signs along State highways." CR72; TxDOT Br. at 29; AusPro Br. at 38-42. The lesser scrutiny applied to regulations targeting secondary effects "has no application to content-based regulations targeting the primary effects of protected speech." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000). Because the election sign exemption is obviously content based, *Reed*, App. 1 at 6, a secondary effects rationale has no application here and strict scrutiny applies.

**C.      TxDOT Cannot Satisfy Its Burden to Show That the Election Sign Exemption Is Narrowly Tailored to Further a Compelling Governmental Interest.**

TxDOT proffers the same governmental interests—aesthetics and traffic safety—rejected by the Supreme Court in *Reed* as "hopelessly underinclusive."

11

App. 1 at 15; TxDOT Br. at 2, 32; CR72 (TxDOT contending that that "[t]he purpose of the HBA is to control the secondary effects of billboards and signs along State highways such as stemming visual clutter on the landscape and promoting travel safety"); TEX. TRANSP. CODE § 391.002(b) (1), (2) (declaring that purpose of Act is to "promote the health, safety, welfare, morals, convenience, and enjoyment of the traveling public" and to "protect the public investment in the interstate and primary systems"). Even if the proffered interests were compelling, which the Supreme Court assumed for the sake of argument, the Court held they were not narrowly tailored. App. 1 at 15. Likewise, even if TxDOT could demonstrate that its interests in aesthetics and safety are compelling enough to severely restrict core political speech, which AusPro does not concede, AusPro Br. at 42-44,[2] the Act and its regulations are not narrowly tailored.

The Court in *Reed* rejected the town's aesthetics rationale, observing that temporary directional signs were "no greater an eyesore" than ideological or political signs, yet the code strictly limited durational signs while permitting other signs to proliferate. App. 1 at 15. The same is true of the election sign exemption,

---

[2] Given that "[l]aws that burden political speech are "subject to strict scrutiny," the Supreme Court in *Citizens United v. Federal Election Commission* invalidated an "outright ban" on corporate speech within 30 days of a primary election and 60 days of a general election, holding that "[n]o sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." 130 S.Ct. 876, 897-98, 913 (2010). The election sign exemption amounts to an even broader outright ban on speech relating to an election for three-fourths of the year, except for a period 90 days before and ten days after an election. TEX. TRANSP. CODE §391.005; App. D.

12

which places strict time limitations on election signs that does not apply to other signs, which are permitted to remain on display all year. *See* AusPro Br. at 44-49. This is not narrow tailoring, but the state impermissibly discriminating against core political speech. *See Whitton v. City of Gladstone*, 54 F.3d 1400, 1407 (8th Cir. 1995) (explaining that "a sign which stated 'Go Royals' would not be subjected to the durational limitations while a sign stating 'Go Ashcroft' would, even though the signs were made of the same material, installed in the same manner, erected on the same spot, posed the same traffic hazards and detracted from the City's aesthetic beauty in the same manner"); *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*, 467 S.E.2d 875, 882 (Ga. 1996) (explaining that city had "not demonstrated that political signs pose a greater danger to the motoring public or detract from the aesthetics of the city any more than other signs, with greater or unlimited durational limitations, permitted in the same zoning districts").

The Supreme Court in *Reed* also rejected the argument that limiting directional signs was necessary to eliminate threats to traffic safety, reasoning that there was no reason to believe directional signs posed a greater traffic hazard than ideological or political signs. App. 1 at 15. "The signs at issue in this case, including political and ideological signs and signs for events, are far removed from those purposes [of traffic safety]. . . . [T]hey are facially content based and are neither justified by traditional safety concerns nor narrowly tailored." *Id.* at 17.

13

Likewise, there is no reason to believe that election signs are more hazardous to public safety than the many other types of signs permitted along state highways and interstates without durational limitations under the Act and its implementing regulations, including (1) directional or official advertising; (2) advertising for the sale or lease of property; (3) on-site commercial advertising promoting an activity on the premises; (4) outdoor advertising for the purpose of protecting life or property; (5) certain signs containing the logo or emblem of an entity that sponsors an agricultural fair, school, or institution of higher education; (6) tourist-oriented directional signs for wineries or businesses related to agriculture or tourism. TEX. TRANSP. CODE §§391.031(b)(1), (2), (3), (5), .037, .099; App. J, M, N; *see* AusPro Br. at 27-30 & n.7; *see also Whitton*, 54 F.3d at 1407; *Union City*, 467 S.E.2d at 882.

The election sign exemption is not narrowly tailored, and should meet the same fate as the sign code in *Reed.* The sign code invalidated in *Reed* limited political signs to 60 days before a primary election and up to 15 days after a general election. *See* App. 1 at 2. Similarly, Texas's election sign exemption limits speech relating to an election to 90 days before and up to ten days after an election. TEX. TRANSP. CODE §391.005; App. D. Even before *Reed*, courts across the country held that such durational limitations on signs are not narrowly tailored to serve compelling governmental interests and amount to unconstitutional limitations

14

on speech. *See, e.g., Curry v. Prince George's County*, 33 F.Supp.2d 447, 455 (D. Md. 1999) ("Extended durational bans on political speech for all but 45 days before and 10 days after a political election, are bans nonetheless—in-consistent [sic] with the 'venerable' status that the Supreme Court has accorded to individual speech . . . ."); *City of Painesville Building Dep't v. Dworken & Bernstein Co., L.P.A.*, 89 Ohio St.3d 564, 573 (2000) (holding ordinance was "not narrowly tailored to further the governmental interests asserted by the city of Painesville, nor do ample alternative means for communicating the desired message exist for such a property owner"); *Knoeffler v. Town of Mamakating*, 87 F.Supp.2d 322, 333, 330 (S.D.N.Y. 2000) (explaining that "durational limits on signs have been repeatedly declared unconstitutional" and holding that ordinance was "not narrowly tailored to" town's interests in aesthetics and safety); *Whitton*, 54 F.3d at 1401-02 & n.2, 1409 (holding that city's durational limitations on campaign signs for 30 days prior and 7 days after election were content-based restrictions that failed to satisfy strict scrutiny and therefore constituted unconstitutional restraints on speech as applied to residential and commercial property); AusPro Br. at 17-18 & n.5 (citing cases).

*Reed* now confirms that a regulation that restricts certain signs based on their content, while allowing other signs to proliferate, is not narrowly tailored to serve the governmental interests of aesthetics and traffic safety.

15

## II. THE COURT SHOULD INVALIDATE BOTH THE ACT AND ITS IMPLEMENTING REGULATIONS.

AusPro challenges both the election sign exemption contained in §391.005 of the Act and its implementing regulations as unconstitutional regulations of core political speech. AusPro Br. at 15-17. Applying the Supreme Court's decision in *Reed*, the Court should hold both the Act and its implementing regulations are unconstitutional because they make distinctions between signs on the basis of their content and are not narrowly tailored to serve a compelling governmental interest. *See* AusPro Br. at 13-49; *supra* Part I. Like the Act, the regulations implementing it permit signs that "relate[ ] only to a public election" to be displayed only during the 100-day window around an election. 43 TEX. ADMIN. CODE §21.146(a)(10); App. E; *see also* TEX. TRANSP. CODE §391.005; App. D.

TxDOT argues that AusPro forfeited its challenge to TxDOT's licensing and permitting regulations as an invalid prior restraint. TxDOT Br. at 35. AusPro challenged both the Act and its implementing regulations throughout this case, as detailed below. On appeal, AusPro specifically detailed how the licensing and permitting regulations operate as an invalid prior restraint *in response* to TxDOT's argument that AusPro could simply apply for a permit to display its sign. *See* CR80; AusPro Br. at 49-55. AusPro has every right to challenge TxDOT's licensing and permitting regime because it was prosecuted civilly for failure to comply with it. CR5-7, 10-11; *see Freedman v. Maryland*, 380 U.S. 51, 56 (1965)

16

("One who might have had a license for the asking may . . . call into question the whole scheme of licensing when he is prosecuted for failure to procure it." (citations and internal quotations omitted)); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969) ("[O]ur decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license.").[3]

Regardless, TxDOT does not argue that AusPro forfeited its broader challenge to TxDOT's regulations on First Amendment grounds, and for good reason. Without question, AusPro preserved its challenge to the licensing and permitting regulations throughout this case. It did so by asserting in its affirmative defenses and trial briefing that "the statutes and regulations on which Plaintiff relies violate AusPro's right to free speech" on their face and as applied under the First Amendment and the Texas Constitution. CR14, 63, 65-70. TxDOT itself relied on the licensing and permitting regulations in its petition, summary

---

[3] Although the Court need not reach AusPro's prior restraint argument if it holds that the Act and its implementing regulations are unconstitutional as content-based regulations of speech, it will be up to the legislature to revisit the Act, and TxDOT to rewrite its regulations. Because AusPro raises significant concerns about how the licensing and permitting regulations chill protected speech and deny judicial review, the Court may wish to caution that any new regulations include an expeditious means for judicial review. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 227 (1990) (plurality) (citing *Freedman*, 380 U.S. at 58-60 (1965)); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70-71 (1963); AusPro Br. at 49-56. TxDOT argues that judicial review is not required for content-neutral regulations, *see* TxDOT Br. at 37-38, 45, but that rationale obviously no longer applies if this Court holds that the Act and regulations are content based.

17

judgment motion, and trial brief. *See* CR3 (citing 43 TEX. ADMIN. CODE §§21.141–.260); CR5 (same); CR16-17, 19, 22, 72-74, 77, 80 (same). Moreover, the parties' agreed stipulated facts asked the trial court to take judicial notice of the Act "and TxDOT's related administrative rules, 43 TEXAS ADMIN. CODE §§ 21.141-.260." CR52. Finally, the trial court specifically ruled in its judgment that the Act and its regulations in "43 TEX. ADMIN. CODE §§21.141–.260, are not unconstitutional as applied to AusPro." App. A at 1.

The Court should reverse the trial court's judgment and hold that the Act and TxDOT's licensing and permitting regulations impermissibly regulate signs based on content, and fail to satisfy strict scrutiny. While the Court could simply strike down the election sign exemption contained in the Act and its regulations and leave the rest of the Act and the regulations intact, it should also more broadly hold that the Act and its regulations are unconstitutional to the extent they regulate signs based on their subject matter. Because AusPro raised both facial and as-applied challenges to the Act and its implementing regulations, both options are available to the Court. *See* AusPro Br. at 13 & n.2. The Supreme Court in *Reed* held the sign code as a whole unconstitutional, *see* App. 1 at 15 (holding that "the Sign Code fails strict scrutiny"), and did not merely invalidate the provision for temporary signs applicable to Petitioners. *Id.* at 2-3 (discussing three categories of exempt signs under the code, including the temporary directional signs applicable to

18

Petitioners); *id.* at 7, 14, 17 (same). Holding the Act and its regulations unconstitutional to the extent they regulate signs based on their subject matter not only be would consistent with the broad holding in *Reed*, but it would also give the Texas Legislature and TxDOT helpful guidance as they rewrite the Act and its implementing regulations.

**III.** **THE TEXAS CONSTITUTION ALSO FORBIDS THE STATE'S REGULATION OF ELECTION SIGNS.**

To the extent there is any doubt that *Reed* governs and requires the Court to hold that the Act and its regulations are unconstitutional under the First Amendment to the United States Constitution (and there should be no such doubt), they are also unconstitutional under the Texas Constitution for the reasons explained in AusPro's opening brief. AusPro Br. at 58-64. While TxDOT tries to dodge the Texas Constitution, TxDOT Br. at 46-48, there is no way around its plain text, which unequivocally prohibits laws "curtailing the liberty of speech or of the press." TEX. CONST. art. I, §§8, 29 (providing that "no law shall ever be passed curtailing the liberty of speech or of the press" and that this right "shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void"); App. G, H. The Act and its implementing regulations violate this simple, yet fundamental guarantee in the Texas Constitution, and should be held unconstitutional on this ground as well.

19

## PRAYER

For the above reasons, AusPro respectfully requests that this Court reverse the trial court's judgment and render judgment that the Act and its implementing regulations violate the First Amendment of the United States Constitution and Article I, sections 8 and 29 of the Texas Constitution.

Respectfully submitted,

*/s/ Meredith B. Parenti*
Meredith B. Parenti
PARENTI LAW PLLC
7500 San Felipe, Suite 600
Houston, TX 77063
[Tel] (281) 224-5848
[Fax] (281) 605-5677
meredith@parentilaw.com
**Counsel for Appellant**
**AusPro Enterprises, LP**

20

**CERTIFICATE OF COMPLIANCE**

I certify that this document was produced on a computer using Microsoft® Word for Mac 2011 and contains 5328 words, as determined by the computer software's word-count function, excluding the sections of the document listed in TEX. R. APP. P. 9.4(i)(1).

*/s/ Meredith B. Parenti*
Meredith B. Parenti

**CERTIFICATE OF SERVICE**

I certify that on July 20, 2015, I served a copy of this filing on the following party via email and through the Court's electronic filing system:

Douglas Geyser
Assistant Solicitor General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
*Counsel for Appellee Texas Department of Transportation*

*/s/ Meredith B. Parenti*
Meredith B. Parenti

No. 03-14-00375-CV

# In the
# Third Court of Appeals
# Austin, Texas

———————

AUSPRO ENTERPRISES, LP,

*Appellant*,

v.

TEXAS DEPARTMENT OF TRANSPORTATION,

*Appellee*.

———————

On Appeal from the 345th Judicial District Court of
Travis County, Texas

———————

**APPELLANT AUSPRO ENTERPRISES, LP'S APPENDIX IN SUPPORT OF
SUPPLEMENTAL BRIEF ON *REED V. TOWN OF GILBERT***

———————

1. *Reed v. Town of Gilbert*, 576 U.S. __, 135 S.Ct. 2218, slip op. (2015).

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## REED ET AL. *v.* TOWN OF GILBERT, ARIZONA, ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–502.　Argued January 12, 2015—Decided June 18, 2015

Gilbert, Arizona (Town), has a comprehensive code (Sign Code or Code) that prohibits the display of outdoor signs without a permit, but exempts 23 categories of signs, including three relevant here. "Ideological Signs," defined as signs "communicating a message or ideas" that do not fit in any other Sign Code category, may be up to 20 square feet and have no placement or time restrictions. "Political Signs," defined as signs "designed to influence the outcome of an election," may be up to 32 square feet and may only be displayed during an election season. "Temporary Directional Signs," defined as signs directing the public to a church or other "qualifying event," have even greater restrictions: No more than four of the signs, limited to six square feet, may be on a single property at any time, and signs may be displayed no more than 12 hours before the "qualifying event" and 1 hour after.

Petitioners, Good News Community Church (Church) and its pastor, Clyde Reed, whose Sunday church services are held at various temporary locations in and near the Town, posted signs early each Saturday bearing the Church name and the time and location of the next service and did not remove the signs until around midday Sunday. The Church was cited for exceeding the time limits for displaying temporary directional signs and for failing to include an event date on the signs. Unable to reach an accommodation with the Town, petitioners filed suit, claiming that the Code abridged their freedom of speech. The District Court denied their motion for a preliminary injunction, and the Ninth Circuit affirmed, ultimately concluding that the Code's sign categories were content neutral, and that the Code satisfied the intermediate scrutiny accorded to content-neutral regulations of speech.

*Held*: The Sign Code's provisions are content-based regulations of

speech that do not survive strict scrutiny. Pp. 6–17.

(a) Because content-based laws target speech based on its communicative content, they are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. *E.g., R. A. V.* v. *St. Paul,* 505 U. S. 377, 395. Speech regulation is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *E.g., Sorrell* v. *IMS Health, Inc.,* 564 U. S. ___, ___–___. And courts are required to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *Id.,* at ___. Whether laws define regulated speech by particular subject matter or by its function or purpose, they are subject to strict scrutiny. The same is true for laws that, though facially content neutral, cannot be " 'justified without reference to the content of the regulated speech,' " or were adopted by the government "because of disagreement with the message" conveyed. *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791. Pp. 6–7.

(b) The Sign Code is content based on its face. It defines the categories of temporary, political, and ideological signs on the basis of their messages and then subjects each category to different restrictions. The restrictions applied thus depend entirely on the sign's communicative content. Because the Code, on its face, is a content-based regulation of speech, there is no need to consider the government's justifications or purposes for enacting the Code to determine whether it is subject to strict scrutiny. Pp. 7.

(c) None of the Ninth Circuit's theories for its contrary holding is persuasive. Its conclusion that the Town's regulation was not based on a disagreement with the message conveyed skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face. A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech. *Cincinnati* v. *Discovery Network, Inc.,* 507 U. S. 410, 429. Thus, an innocuous justification cannot transform a facially content-based law into one that is content neutral. A court must evaluate each question—whether a law is content based on its face and whether the purpose and justification for the law are content based—before concluding that a law is content neutral. *Ward* does not require otherwise, for its framework applies only to a content-neutral statute.

The Ninth Circuit's conclusion that the Sign Code does not single out any idea or viewpoint for discrimination conflates two distinct but related limitations that the First Amendment places on government regulation of speech. Government discrimination among viewpoints

is a "more blatant" and "egregious form of content discrimination," *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829, but "[t]he First Amendment's hostility to content-based regulation [also] extends . . . to prohibition of public discussion of an entire topic," *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537. The Sign Code, a paradigmatic example of content-based discrimination, singles out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter.

The Ninth Circuit also erred in concluding that the Sign Code was not content based because it made only speaker-based and event-based distinctions. The Code's categories are not speaker-based—the restrictions for political, ideological, and temporary event signs apply equally no matter who sponsors them. And even if the sign categories were speaker based, that would not automatically render the law content neutral. Rather, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 658. This same analysis applies to event-based distinctions. Pp. 8–14.

(d) The Sign Code's content-based restrictions do not survive strict scrutiny because the Town has not demonstrated that the Code's differentiation between temporary directional signs and other types of signs furthers a compelling governmental interest and is narrowly tailored to that end. See *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. ___, ___. Assuming that the Town has a compelling interest in preserving its aesthetic appeal and traffic safety, the Code's distinctions are highly underinclusive. The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town when other types of signs create the same problem. See *Discovery Network*, *supra,* at 425. Nor has it shown that temporary directional signs pose a greater threat to public safety than ideological or political signs. Pp. 14–15.

(e) This decision will not prevent governments from enacting effective sign laws. The Town has ample content-neutral options available to resolve problems with safety and aesthetics, including regulating size, building materials, lighting, moving parts, and portability. And the Town may be able to forbid postings on public property, so long as it does so in an evenhanded, content-neutral manner. See *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 817. An ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers—*e.g.,* warning signs marking hazards on private property or signs directing traffic—might also survive strict scrutiny. Pp. 16–17.

707 F. 3d 1057, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, ALITO, and SOTOMAYOR, JJ., joined. ALITO, J., filed a concurring opinion, in which KENNEDY and SOTOMAYOR, JJ., joined. BREYER, J., filed an opinion concurring in the judgment. KA-GAN, J., filed an opinion concurring in the judgment, in which GINSBURG and BREYER, JJ., joined

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 13–502

―――――――

## CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF GILBERT, ARIZONA, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE THOMAS delivered the opinion of the Court.

The town of Gilbert, Arizona (or Town), has adopted a comprehensive code governing the manner in which people may display outdoor signs. Gilbert, Ariz., Land Development Code (Sign Code or Code), ch. 1, §4.402 (2005).[1] The Sign Code identifies various categories of signs based on the type of information they convey, then subjects each category to different restrictions. One of the categories is "Temporary Directional Signs Relating to a Qualifying Event," loosely defined as signs directing the public to a meeting of a nonprofit group. §4.402(P). The Code imposes more stringent restrictions on these signs than it does on signs conveying other messages. We hold that these provisions are content-based regulations of speech that cannot survive strict scrutiny.

――――――

[1] The Town's Sign Code is available online at http://www.gilbertaz.gov/departments/development-service/planning-development/land-development-code (as visited June 16, 2015, and available in Clerk of Court's case file).

I

A

The Sign Code prohibits the display of outdoor signs anywhere within the Town without a permit, but it then exempts 23 categories of signs from that requirement. These exemptions include everything from bazaar signs to flying banners. Three categories of exempt signs are particularly relevant here.

The first is "Ideological Sign[s]." This category includes any "sign communicating a message or ideas for noncommercial purposes that is not a Construction Sign, Directional Sign, Temporary Directional Sign Relating to a Qualifying Event, Political Sign, Garage Sale Sign, or a sign owned or required by a governmental agency." Sign Code, Glossary of General Terms (Glossary), p. 23 (emphasis deleted). Of the three categories discussed here, the Code treats ideological signs most favorably, allowing them to be up to 20 square feet in area and to be placed in all "zoning districts" without time limits. §4.402(J).

The second category is "Political Sign[s]." This includes any "temporary sign designed to influence the outcome of an election called by a public body." Glossary 23.[2] The Code treats these signs less favorably than ideological signs. The Code allows the placement of political signs up to 16 square feet on residential property and up to 32 square feet on nonresidential property, undeveloped municipal property, and "rights-of-way." §4.402(I).[3] These signs may be displayed up to 60 days before a primary election and up to 15 days following a general election. *Ibid.*

————————
[2] A "Temporary Sign" is a "sign not permanently attached to the ground, a wall or a building, and not designed or intended for permanent display." Glossary 25.

[3] The Code defines "Right-of-Way" as a "strip of publicly owned land occupied by or planned for a street, utilities, landscaping, sidewalks, trails, and similar facilities." *Id.,* at 18.

The third category is "Temporary Directional Signs
Relating to a Qualifying Event." This includes any "Tem-
porary Sign intended to direct pedestrians, motorists, and
other passersby to a 'qualifying event.'" Glossary 25
(emphasis deleted). A "qualifying event" is defined as any
"assembly, gathering, activity, or meeting sponsored,
arranged, or promoted by a religious, charitable, commu-
nity service, educational, or other similar non-profit organ-
ization." *Ibid.* The Code treats temporary directional
signs even less favorably than political signs.[4] Temporary
directional signs may be no larger than six square feet.
§4.402(P). They may be placed on private property or on a
public right-of-way, but no more than four signs may be
placed on a single property at any time. *Ibid.* And, they
may be displayed no more than 12 hours before the "quali-
fying event" and no more than 1 hour afterward. *Ibid.*

B

Petitioners Good News Community Church (Church)
and its pastor, Clyde Reed, wish to advertise the time and
location of their Sunday church services. The Church is a
small, cash-strapped entity that owns no building, so it
holds its services at elementary schools or other locations
in or near the Town. In order to inform the public about
its services, which are held in a variety of different loca-

———————

[4] The Sign Code has been amended twice during the pendency of this
case. When litigation began in 2007, the Code defined the signs at
issue as "Religious Assembly Temporary Direction Signs." App. 75.
The Code entirely prohibited placement of those signs in the public
right-of-way, and it forbade posting them in any location for more than
two hours before the religious assembly or more than one hour after-
ward. *Id.,* at 75–76. In 2008, the Town redefined the category as
"Temporary Directional Signs Related to a Qualifying Event," and it
expanded the time limit to 12 hours before and 1 hour after the "quali-
fying event." *Ibid.* In 2011, the Town amended the Code to authorize
placement of temporary directional signs in the public right-of-way.
*Id.,* at 89.

tions, the Church began placing 15 to 20 temporary signs around the Town, frequently in the public right-of-way abutting the street. The signs typically displayed the Church's name, along with the time and location of the upcoming service. Church members would post the signs early in the day on Saturday and then remove them around midday on Sunday. The display of these signs requires little money and manpower, and thus has proved to be an economical and effective way for the Church to let the community know where its services are being held each week.

This practice caught the attention of the Town's Sign Code compliance manager, who twice cited the Church for violating the Code. The first citation noted that the Church exceeded the time limits for displaying its temporary directional signs. The second citation referred to the same problem, along with the Church's failure to include the date of the event on the signs. Town officials even confiscated one of the Church's signs, which Reed had to retrieve from the municipal offices.

Reed contacted the Sign Code Compliance Department in an attempt to reach an accommodation. His efforts proved unsuccessful. The Town's Code compliance manager informed the Church that there would be "no leniency under the Code" and promised to punish any future violations.

Shortly thereafter, petitioners filed a complaint in the United States District Court for the District of Arizona, arguing that the Sign Code abridged their freedom of speech in violation of the First and Fourteenth Amendments. The District Court denied the petitioners' motion for a preliminary injunction. The Court of Appeals for the Ninth Circuit affirmed, holding that the Sign Code's provision regulating temporary directional signs did not regulate speech on the basis of content. 587 F. 3d 966, 979 (2009). It reasoned that, even though an enforcement

officer would have to read the sign to determine what provisions of the Sign Code applied to it, the "'kind of cursory examination'" that would be necessary for an officer to classify it as a temporary directional sign was "not akin to an officer synthesizing the expressive content of the sign." *Id.*, at 978. It then remanded for the District Court to determine in the first instance whether the Sign Code's distinctions among temporary directional signs, political signs, and ideological signs nevertheless constituted a content-based regulation of speech.

On remand, the District Court granted summary judgment in favor of the Town. The Court of Appeals again affirmed, holding that the Code's sign categories were content neutral. The court concluded that "the distinctions between Temporary Directional Signs, Ideological Signs, and Political Signs . . . are based on objective factors relevant to Gilbert's creation of the specific exemption from the permit requirement and do not otherwise consider the substance of the sign." 707 F. 3d 1057, 1069 (CA9 2013). Relying on this Court's decision in *Hill* v. *Colorado*, 530 U. S. 703 (2000), the Court of Appeals concluded that the Sign Code is content neutral. 707 F. 3d, at 1071–1072. As the court explained, "Gilbert did not adopt its regulation of speech because it disagreed with the message conveyed" and its "interests in regulat[ing] temporary signs are unrelated to the content of the sign." *Ibid.* Accordingly, the court believed that the Code was "content-neutral as that term [has been] defined by the Supreme Court." *Id.,* at 1071. In light of that determination, it applied a lower level of scrutiny to the Sign Code and concluded that the law did not violate the First Amendment. *Id.*, at 1073–1076.

We granted certiorari, 573 U. S. ___ (2014), and now reverse.

## II
## A

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U. S. Const., Amdt. 1. Under that Clause, a government, including a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. *R. A. V.* v. *St. Paul*, 505 U. S. 377, 395 (1992); *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 115, 118 (1991).

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *E.g., Sorrell* v. *IMS Health, Inc.*, 564 U. S. ___, ___–___ (2011) (slip op., at 8–9); *Carey* v. *Brown*, 447 U. S. 455, 462 (1980); *Mosley*, *supra*, at 95. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *Sorrell*, *supra*, at ___ (slip op., at 8). Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to

the content of the regulated speech,'" or that were adopted by the government "because of disagreement with the message [the speech] conveys," *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989). Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

B

The Town's Sign Code is content based on its face. It defines "Temporary Directional Signs" on the basis of whether a sign conveys the message of directing the public to church or some other "qualifying event." Glossary 25. It defines "Political Signs" on the basis of whether a sign's message is "designed to influence the outcome of an election." *Id.,* at 24. And it defines "Ideological Signs" on the basis of whether a sign "communicat[es] a message or ideas" that do not fit within the Code's other categories. *Id.,* at 23. It then subjects each of these categories to different restrictions.

The restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign. If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government. More to the point, the Church's signs inviting people to attend its worship services are treated differently from signs conveying other types of ideas. On its face, the Sign Code is a content-based regulation of speech. We thus have no need to consider the government's justifications or purposes for enacting the Code to determine whether it is subject to strict scrutiny.

### C

In reaching the contrary conclusion, the Court of Appeals offered several theories to explain why the Town's Sign Code should be deemed content neutral. None is persuasive.

### 1

The Court of Appeals first determined that the Sign Code was content neutral because the Town "did not adopt its regulation of speech [based on] disagree[ment] with the message conveyed," and its justifications for regulating temporary directional signs were "unrelated to the content of the sign." 707 F. 3d, at 1071–1072. In its brief to this Court, the United States similarly contends that a sign regulation is content neutral—even if it expressly draws distinctions based on the sign's communicative content—if those distinctions can be "'justified without reference to the content of the regulated speech.'" Brief for United States as *Amicus Curiae* 20, 24 (quoting *Ward, supra*, at 791; emphasis deleted).

But this analysis skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face. A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech. *Cincinnati* v. *Discovery Network, Inc.,* 507 U. S. 410, 429 (1993). We have thus made clear that "'[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment,'" and a party opposing the government "need adduce 'no evidence of an improper censorial motive.'" *Simon & Schuster, supra,* at 117. Although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642 (1994). In other words, an

innocuous justification cannot transform a facially content-based law into one that is content neutral.

That is why we have repeatedly considered whether a law is content neutral on its face *before* turning to the law's justification or purpose. See, *e.g., Sorrell, supra,* at \_\_\_–\_\_\_ (slip op., at 8–9) (statute was content based "on its face," and there was also evidence of an impermissible legislative motive); *United States* v. *Eichman*, 496 U. S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted *interest* is related to the suppression of free expression" (internal quotation marks omitted)); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 804 (1984) ("The text of the ordinance is neutral," and "there is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance"); *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984) (requiring that a facially content-neutral ban on camping must be "justified without reference to the content of the regulated speech"); *United States* v. *O'Brien*, 391 U. S. 367, 375, 377 (1968) (noting that the statute "on its face deals with conduct having no connection with speech," but examining whether the "the governmental interest is unrelated to the suppression of free expression"). Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny.

The Court of Appeals and the United States misunderstand our decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content based on its face. That is incorrect. *Ward* had nothing to say about facially content-based restrictions because it involved a facially content-*neutral* ban on the use, in a

city-owned music venue, of sound amplification systems not provided by the city. 491 U. S., at 787, and n. 2. In that context, we looked to governmental motive, including whether the government had regulated speech "because of disagreement" with its message, and whether the regulation was "'justified without reference to the content of the speech.'" *Id.,* at 791. But *Ward*'s framework "applies only if a statute is content neutral." *Hill*, 530 U. S., at 766 (KENNEDY, J., dissenting). Its rules thus operate "to protect speech," not "to restrict it." *Id.,* at 765.

The First Amendment requires no less. Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—*i.e.,* the "abridg[ement] of speech"—rather than merely the motives of those who enacted them. U. S. Const., Amdt. 1. "'The vice of content-based legislation . . . is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.'" *Hill, supra,* at 743 (SCALIA, J., dissenting).

For instance, in *NAACP* v. *Button*, 371 U. S. 415 (1963), the Court encountered a State's attempt to use a statute prohibiting "'improper solicitation'" by attorneys to outlaw litigation-related speech of the National Association for the Advancement of Colored People. *Id.,* at 438. Although *Button* predated our more recent formulations of strict scrutiny, the Court rightly rejected the State's claim that its interest in the "regulation of professional conduct" rendered the statute consistent with the First Amendment, observing that "it is no answer . . . to say . . . that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression." *Id.,* at 438–439. Likewise, one could easily imagine a Sign Code compliance manager who disliked the Church's

substantive teachings deploying the Sign Code to make it more difficult for the Church to inform the public of the location of its services. Accordingly, we have repeatedly "rejected the argument that 'discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas.'" *Discovery Network,* 507 U. S., at 429. We do so again today.

2

The Court of Appeals next reasoned that the Sign Code was content neutral because it "does not mention any idea or viewpoint, let alone single one out for differential treatment." 587 F. 3d, at 977. It reasoned that, for the purpose of the Code provisions, "[i]t makes no difference which candidate is supported, who sponsors the event, or what ideological perspective is asserted." 707 F. 3d, at 1069.

The Town seizes on this reasoning, insisting that "content based" is a term of art that "should be applied flexibly" with the goal of protecting "viewpoints and ideas from government censorship or favoritism." Brief for Respondents 22. In the Town's view, a sign regulation that "does not censor or favor particular viewpoints or ideas" cannot be content based. *Ibid.* The Sign Code allegedly passes this test because its treatment of temporary directional signs does not raise any concerns that the government is "endorsing or suppressing 'ideas or viewpoints,'" *id.*, at 27, and the provisions for political signs and ideological signs "are neutral as to particular ideas or viewpoints" within those categories. *Id.*, at 37.

This analysis conflates two distinct but related limitations that the First Amendment places on government regulation of speech. Government discrimination among viewpoints—or the regulation of speech based on "the specific motivating ideology or the opinion or perspective of the speaker"—is a "more blatant" and "egregious form of

content discrimination." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). But it is well established that "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537 (1980).

Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. *Ibid.* For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed. See *Discovery Network, supra,* at 428. The Town's Sign Code likewise singles out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter. Ideological messages are given more favorable treatment than messages concerning a political candidate, which are themselves given more favorable treatment than messages announcing an assembly of like-minded individuals. That is a paradigmatic example of content-based discrimination.

3

Finally, the Court of Appeals characterized the Sign Code's distinctions as turning on "'the content-neutral elements of who is speaking through the sign and whether and when an event is occurring.'" 707 F. 3d, at 1069. That analysis is mistaken on both factual and legal grounds.

To start, the Sign Code's distinctions are not speaker based. The restrictions for political, ideological, and temporary event signs apply equally no matter who sponsors them. If a local business, for example, sought to put up

signs advertising the Church's meetings, those signs would be subject to the same limitations as such signs placed by the Church. And if Reed had decided to display signs in support of a particular candidate, he could have made those signs far larger—and kept them up for far longer—than signs inviting people to attend his church services. If the Code's distinctions were truly speaker based, both types of signs would receive the same treatment.

In any case, the fact that a distinction is speaker based does not, as the Court of Appeals seemed to believe, automatically render the distinction content neutral. Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 340 (2010), we have insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Turner,* 512 U. S., at 658. Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based. Likewise, a content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers. See *Citizens United, supra*, at 340–341. Characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry.

Nor do the Sign Code's distinctions hinge on "whether and when an event is occurring." The Code does not permit citizens to post signs on any topic whatsoever within a set period leading up to an election, for example. Instead, come election time, it requires Town officials to determine whether a sign is "designed to influence the outcome of an election" (and thus "political") or merely "communicating a message or ideas for noncommercial purposes" (and thus "ideological"). Glossary 24. That obvious content-based

inquiry does not evade strict scrutiny review simply be-
cause an event (*i.e.,* an election) is involved.

And, just as with speaker-based laws, the fact that a
distinction is event based does not render it content neu-
tral.  The Court of Appeals cited no precedent from this
Court supporting its novel theory of an exception from the
content-neutrality requirement for event-based laws.  As
we have explained, a speech regulation is content based if
the law applies to particular speech because of the topic
discussed or the idea or message expressed.  *Supra,* at 6.
A regulation that targets a sign because it conveys an idea
about a specific event is no less content based than a
regulation that targets a sign because it conveys some
other idea.  Here, the Code singles out signs bearing a
particular message: the time and location of a specific
event.  This type of ordinance may seem like a perfectly
rational way to regulate signs, but a clear and firm rule
governing content neutrality is an essential means of
protecting the freedom of speech, even if laws that might
seem "entirely reasonable" will sometimes be "struck down
because of their content-based nature."  *City of Ladue* v.
*Gilleo,* 512 U. S. 43, 60 (1994) (O'Connor, J., concurring).

## III

Because the Town's Sign Code imposes content-based
restrictions on speech, those provisions can stand only if
they survive strict scrutiny, "'which requires the Govern-
ment to prove that the restriction furthers a compelling
interest and is narrowly tailored to achieve that interest,'"
*Arizona Free Enterprise Club's Freedom Club PAC* v.
*Bennett,* 564 U. S. ___, ___ (2011) (slip op., at 8) (quoting
*Citizens United,* 558 U. S*.,* at 340).  Thus, it is the Town's
burden to demonstrate that the Code's differentiation
between temporary directional signs and other types of
signs, such as political signs and ideological signs, furthers
a compelling governmental interest and is narrowly tai-

lored to that end. See *ibid.*

The Town cannot do so. It has offered only two governmental interests in support of the distinctions the Sign Code draws: preserving the Town's aesthetic appeal and traffic safety. Assuming for the sake of argument that those are compelling governmental interests, the Code's distinctions fail as hopelessly underinclusive.

Starting with the preservation of aesthetics, temporary directional signs are "no greater an eyesore," *Discovery Network*, 507 U. S.*,* at 425, than ideological or political ones. Yet the Code allows unlimited proliferation of larger ideological signs while strictly limiting the number, size, and duration of smaller directional ones. The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem.

The Town similarly has not shown that limiting temporary directional signs is necessary to eliminate threats to traffic safety, but that limiting other types of signs is not. The Town has offered no reason to believe that directional signs pose a greater threat to safety than do ideological or political signs. If anything, a sharply worded ideological sign seems more likely to distract a driver than a sign directing the public to a nearby church meeting.

In light of this underinclusiveness, the Town has not met its burden to prove that its Sign Code is narrowly tailored to further a compelling government interest. Because a "'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited,'" *Republican Party of Minn.* v. *White*, 536 U. S. 765, 780 (2002), the Sign Code fails strict scrutiny.

IV

Our decision today will not prevent governments from enacting effective sign laws.  The Town asserts that an "'absolutist'" content-neutrality rule would render "virtually all distinctions in sign laws . . . subject to strict scrutiny," Brief for Respondents 34–35, but that is not the case.  Not "all distinctions" are subject to strict scrutiny, only *content-based* ones are.  Laws that are *content neutral* are instead subject to lesser scrutiny.  See *Clark*, 468 U. S., at 295.

The Town has ample content-neutral options available to resolve problems with safety and aesthetics.  For example, its current Code regulates many aspects of signs that have nothing to do with a sign's message: size, building materials, lighting, moving parts, and portability.  See, *e.g.,* §4.402(R).  And on public property, the Town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner.  See *Taxpayers for Vincent*, 466 U. S., at 817 (upholding content-neutral ban against posting signs on public property).  Indeed, some lower courts have long held that similar content-based sign laws receive strict scrutiny, but there is no evidence that towns in those jurisdictions have suffered catastrophic effects.  See, *e.g., Solantic, LLC* v. *Neptune Beach*, 410 F. 3d 1250, 1264–1269 (CA11 2005) (sign categories similar to the town of Gilbert's were content based and subject to strict scrutiny); *Matthews* v. *Needham*, 764 F. 2d 58, 59–60 (CA1 1985) (law banning political signs but not commercial signs was content based and subject to strict scrutiny).

We acknowledge that a city might reasonably view the general regulation of signs as necessary because signs "take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation."  *City of Ladue*, 512 U. S., at 48.  At the same time, the presence of certain

signs may be essential, both for vehicles and pedestrians, to guide traffic or to identify hazards and ensure safety. A sign ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers—such as warning signs marking hazards on private property, signs directing traffic, or street numbers associated with private houses—well might survive strict scrutiny. The signs at issue in this case, including political and ideological signs and signs for events, are far removed from those purposes. As discussed above, they are facially content based and are neither justified by traditional safety concerns nor narrowly tailored.

*    *    *

We reverse the judgment of the Court of Appeals and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 13–502

CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF
GILBERT, ARIZONA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE ALITO, with whom JUSTICE KENNEDY and
JUSTICE SOTOMAYOR join, concurring.

I join the opinion of the Court but add a few words of
further explanation.

As the Court holds, what we have termed "content-
based" laws must satisfy strict scrutiny.  Content-based
laws merit this protection because they present, albeit
sometimes in a subtler form, the same dangers as laws
that regulate speech based on viewpoint.  Limiting speech
based on its "topic" or "subject" favors those who do not
want to disturb the status quo.  Such regulations may
interfere with democratic self-government and the search
for truth.  See *Consolidated Edison Co. of N. Y.* v. *Public
Serv. Comm'n of N. Y.*, 447 U. S. 530, 537 (1980).

As the Court shows, the regulations at issue in this case
are replete with content-based distinctions, and as a result
they must satisfy strict scrutiny.  This does not mean,
however, that municipalities are powerless to enact and
enforce reasonable sign regulations.  I will not attempt to
provide anything like a comprehensive list, but here are
some rules that would not be content based:

Rules regulating the size of signs.  These rules may
distinguish among signs based on any content-neutral
criteria, including any relevant criteria listed below.

Rules regulating the locations in which signs may be

placed. These rules may distinguish between freestanding signs and those attached to buildings.

Rules distinguishing between lighted and unlighted signs.

Rules distinguishing between signs with fixed messages and electronic signs with messages that change.

Rules that distinguish between the placement of signs on private and public property.

Rules distinguishing between the placement of signs on commercial and residential property.

Rules distinguishing between on-premises and off-premises signs.

Rules restricting the total number of signs allowed per mile of roadway.

Rules imposing time restrictions on signs advertising a one-time event. Rules of this nature do not discriminate based on topic or subject and are akin to rules restricting the times within which oral speech or music is allowed.*

In addition to regulating signs put up by private actors, government entities may also erect their own signs consistent with the principles that allow governmental speech. See *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–469 (2009). They may put up all manner of signs to promote safety, as well as directional signs and signs pointing out historic sites and scenic spots.

Properly understood, today's decision will not prevent cities from regulating signs in a way that fully protects public safety and serves legitimate esthetic objectives.

———————

*Of course, content-neutral restrictions on speech are not necessarily consistent with the First Amendment. Time, place, and manner restrictions "must be narrowly tailored to serve the government's legitimate, content-neutral interests." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 798 (1989). But they need not meet the high standard imposed on viewpoint- and content-based restrictions.

# SUPREME COURT OF THE UNITED STATES

---

No. 13–502

---

## CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF GILBERT, ARIZONA, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE BREYER, concurring in the judgment.

I join JUSTICE KAGAN's separate opinion. Like JUSTICE KAGAN I believe that categories alone cannot satisfactorily resolve the legal problem before us. The First Amendment requires greater judicial sensitivity both to the Amendment's expressive objectives and to the public's legitimate need for regulation than a simple recitation of categories, such as "content discrimination" and "strict scrutiny," would permit. In my view, the category "content discrimination" is better considered in many contexts, including here, as a rule of thumb, rather than as an automatic "strict scrutiny" trigger, leading to almost certain legal condemnation.

To use content discrimination to trigger strict scrutiny sometimes makes perfect sense. There are cases in which the Court has found content discrimination an unconstitutional method for suppressing a viewpoint. *E.g., Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828–829 (1995); see also *Boos* v. *Barry*, 485 U. S. 312, 318–319 (1988) (plurality opinion) (applying strict scrutiny where the line between subject matter and viewpoint was not obvious). And there are cases where the Court has found content discrimination to reveal that rules governing a traditional public forum are, in fact, not a neutral way of fairly managing the forum in the interest of all

speakers. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972) ("Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say"). In these types of cases, strict scrutiny is often appropriate, and content discrimination has thus served a useful purpose.

But content discrimination, while helping courts to identify unconstitutional suppression of expression, cannot and should not *always* trigger strict scrutiny. To say that it is not an automatic "strict scrutiny" trigger is not to argue against that concept's use. I readily concede, for example, that content discrimination, as a conceptual tool, can sometimes reveal weaknesses in the government's rationale for a rule that limits speech. If, for example, a city looks to litter prevention as the rationale for a prohibition against placing newsracks dispensing free advertisements on public property, why does it exempt other newsracks causing similar litter? Cf. *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410 (1993). I also concede that, whenever government disfavors one kind of speech, it places that speech at a disadvantage, potentially interfering with the free marketplace of ideas and with an individual's ability to express thoughts and ideas that can help that individual determine the kind of society in which he wishes to live, help shape that society, and help define his place within it.

Nonetheless, in these latter instances to use the presence of content discrimination automatically to trigger strict scrutiny and thereby call into play a strong presumption against constitutionality goes too far. That is because virtually all government activities involve speech, many of which involve the regulation of speech. Regulatory programs almost always require content discrimination. And to hold that such content discrimination triggers strict scrutiny is to write a recipe for judicial management

of ordinary government regulatory activity.

Consider a few examples of speech regulated by government that inevitably involve content discrimination, but where a strong presumption against constitutionality has no place. Consider governmental regulation of securities, *e.g.,* 15 U. S. C. §78*l* (requirements for content that must be included in a registration statement); of energy conservation labeling-practices, *e.g.,* 42 U. S. C. §6294 (requirements for content that must be included on labels of certain consumer electronics); of prescription drugs, *e.g.,* 21 U. S. C. §353(b)(4)(A) (requiring a prescription drug label to bear the symbol "Rx only"); of doctor-patient confidentiality, *e.g.,* 38 U. S. C. §7332 (requiring confidentiality of certain medical records, but allowing a physician to disclose that the patient has HIV to the patient's spouse or sexual partner); of income tax statements, *e.g.,* 26 U. S. C. §6039F (requiring taxpayers to furnish information about foreign gifts received if the aggregate amount exceeds $10,000); of commercial airplane briefings, *e.g.,* 14 CFR §136.7 (2015) (requiring pilots to ensure that each passenger has been briefed on flight procedures, such as seatbelt fastening); of signs at petting zoos, *e.g.,* N. Y. Gen. Bus. Law Ann. §399–ff(3) (West Cum. Supp. 2015) (requiring petting zoos to post a sign at every exit "'strongly recommend[ing] that persons wash their hands upon exiting the petting zoo area'"); and so on.

Nor can the majority avoid the application of strict scrutiny to all sorts of justifiable governmental regulations by relying on this Court's many subcategories and exceptions to the rule. The Court has said, for example, that we should apply less strict standards to "commercial speech." *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 557, 562–563 (1980). But I have great concern that many justifiable instances of "content-based" regulation are noncommercial. And, worse than that, the Court has applied the heightened

"strict scrutiny" standard even in cases where the less stringent "commercial speech" standard was appropriate. See *Sorrell* v. *IMS Health Inc.*, 564 U. S. \_\_\_, \_\_\_ (2011) (Breyer, J., dissenting) (slip op., at \_\_\_ ). The Court has also said that "government speech" escapes First Amendment strictures. See *Rust* v. *Sullivan*, 500 U. S. 173, 193–194 (1991). But regulated speech is typically private speech, not government speech. Further, the Court has said that, "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 388 (1992). But this exception accounts for only a few of the instances in which content discrimination is readily justifiable.

I recognize that the Court could escape the problem by watering down the force of the presumption against constitutionality that "strict scrutiny" normally carries with it. But, in my view, doing so will weaken the First Amendment's protection in instances where "strict scrutiny" should apply in full force.

The better approach is to generally treat content discrimination as a strong reason weighing against the constitutionality of a rule where a traditional public forum, or where viewpoint discrimination, is threatened, but elsewhere treat it as a rule of thumb, finding it a helpful, but not determinative legal tool, in an appropriate case, to determine the strength of a justification. I would use content discrimination as a supplement to a more basic analysis, which, tracking most of our First Amendment cases, asks whether the regulation at issue works harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives. Answering this question requires examining the seriousness of the harm to speech, the importance of the countervailing objectives, the extent to which the law will achieve those objectives,

BREYER, J., concurring in judgment

and whether there are other, less restrictive ways of doing so. See, *e.g., United States* v. *Alvarez*, 567 U. S. \_\_\_, \_\_\_–\_\_\_ (2012) (BREYER, J., concurring in judgment) (slip op., at 1–3); *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 400–403 (2000) (BREYER, J., concurring). Admittedly, this approach does not have the simplicity of a mechanical use of categories. But it does permit the government to regulate speech in numerous instances where the voters have authorized the government to regulate and where courts should hesitate to substitute judicial judgment for that of administrators.

Here, regulation of signage along the roadside, for purposes of safety and beautification is at issue. There is no traditional public forum nor do I find any general effort to censor a particular viewpoint. Consequently, the specific regulation at issue does not warrant "strict scrutiny." Nonetheless, for the reasons that JUSTICE KAGAN sets forth, I believe that the Town of Gilbert's regulatory rules violate the First Amendment. I consequently concur in the Court's judgment only.

# SUPREME COURT OF THE UNITED STATES

No. 13–502

CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF
GILBERT, ARIZONA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE KAGAN, with whom JUSTICE GINSBURG and
JUSTICE BREYER join, concurring in the judgment.

Countless cities and towns across America have adopted
ordinances regulating the posting of signs, while exempt-
ing certain categories of signs based on their subject mat-
ter. For example, some municipalities generally prohibit
illuminated signs in residential neighborhoods, but lift
that ban for signs that identify the address of a home or
the name of its owner or occupant. See, *e.g.*, City of Truth
or Consequences, N. M., Code of Ordinances, ch. 16, Art.
XIII, §§11–13–2.3, 11–13–2.9(H)(4) (2014). In other mu-
nicipalities, safety signs such as "Blind Pedestrian Cross-
ing" and "Hidden Driveway" can be posted without a
permit, even as other permanent signs require one. See,
*e.g.*, Code of Athens-Clarke County, Ga., Pt. III, §7–4–7(1)
(1993). Elsewhere, historic site markers—for example,
"George Washington Slept Here"—are also exempt from
general regulations. See, *e.g.*, Dover, Del., Code of Ordi-
nances, Pt. II, App. B, Art. 5, §4.5(F) (2012). And simi-
larly, the federal Highway Beautification Act limits signs
along interstate highways unless, for instance, they direct
travelers to "scenic and historical attractions" or advertise
free coffee. See 23 U. S. C. §§131(b), (c)(1), (c)(5).

Given the Court's analysis, many sign ordinances of that
kind are now in jeopardy. See *ante*, at 14 (acknowledging

that "entirely reasonable" sign laws "will sometimes be struck down" under its approach (internal quotation marks omitted)). Says the majority: When laws "single[] out specific subject matter," they are "facially content based"; and when they are facially content based, they are automatically subject to strict scrutiny. *Ante*, at 12, 16–17. And although the majority holds out hope that some sign laws with subject-matter exemptions "might survive" that stringent review, *ante*, at 17, the likelihood is that most will be struck down. After all, it is the "rare case[] in which a speech restriction withstands strict scrutiny." *Williams-Yulee* v. *Florida Bar*, 575 U. S. ___, ___ (2015) (slip op., at 9). To clear that high bar, the government must show that a content-based distinction "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 231 (1987). So on the majority's view, courts would have to determine that a town has a compelling interest in informing passersby where George Washington slept. And likewise, courts would have to find that a town has no other way to prevent hidden-driveway mishaps than by specially treating hidden-driveway signs. (Well-placed speed bumps? Lower speed limits? Or how about just a ban on hidden driveways?) The consequence—unless courts water down strict scrutiny to something unrecognizable—is that our communities will find themselves in an unenviable bind: They will have to either repeal the exemptions that allow for helpful signs on streets and sidewalks, or else lift their sign restrictions altogether and resign themselves to the resulting clutter.*

————————

*Even in trying (commendably) to limit today's decision, JUSTICE ALITO's concurrence highlights its far-reaching effects. According to JUSTICE ALITO, the majority does not subject to strict scrutiny regulations of "signs advertising a one-time event." *Ante*, at 2 (ALITO, J., concurring). But of course it does. On the majority's view, a law with an exception for such signs "singles out specific subject matter for

Although the majority insists that applying strict scrutiny to all such ordinances is "essential" to protecting First Amendment freedoms, *ante*, at 14, I find it challenging to understand why that is so. This Court's decisions articulate two important and related reasons for subjecting content-based speech regulations to the most exacting standard of review. The first is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen* v. *Coakley*, 573 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 8–9) (internal quotation marks omitted). The second is to ensure that the government has not regulated speech "based on hostility—or favoritism—towards the underlying message expressed." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 386 (1992). Yet the subject-matter exemptions included in many sign ordinances do not implicate those concerns. Allowing residents, say, to install a light bulb over "name and address" signs but no others does not distort the marketplace of ideas. Nor does that different treatment give rise to an inference of impermissible government motive.

We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any "realistic possibility that official suppression of ideas is afoot." *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 189 (2007) (quoting *R. A. V.*, 505 U. S., at 390). That is always the case when the regulation facially differentiates on the basis of viewpoint. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). It is also the case (except in nonpublic or limited public forums) when a law restricts "discussion of an entire topic" in public debate. *Consolidated*

—————

differential treatment" and "defin[es] regulated speech by particular subject matter." *Ante*, at 6, 12 (majority opinion). Indeed, the precise reason the majority applies strict scrutiny here is that "the Code singles out signs bearing a particular message: the time and location of a specific event." *Ante*, at 14.

*Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537, 539–540 (1980) (invalidating a limitation on speech about nuclear power). We have stated that "[i]f the marketplace of ideas is to remain free and open, governments must not be allowed to choose 'which issues are worth discussing or debating.'" *Id.*, at 537–538 (quoting *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972)). And we have recognized that such subject-matter restrictions, even though viewpoint-neutral on their face, may "suggest[] an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 785 (1978); accord, *ante*, at 1 (ALITO, J., concurring) (limiting all speech on one topic "favors those who do not want to disturb the status quo"). Subject-matter regulation, in other words, may have the intent or effect of favoring some ideas over others. When that is realistically possible—when the restriction "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace"—we insist that the law pass the most demanding constitutional test. *R. A. V.*, 505 U. S., at 387 (quoting *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991)).

But when that is not realistically possible, we may do well to relax our guard so that "entirely reasonable" laws imperiled by strict scrutiny can survive. *Ante*, at 14. This point is by no means new. Our concern with content-based regulation arises from the fear that the government will skew the public's debate of ideas—so when "that risk is inconsequential, . . . strict scrutiny is unwarranted." *Davenport*, 551 U. S., at 188; see *R. A. V.*, 505 U. S., at 388 (approving certain content-based distinctions when there is "no significant danger of idea or viewpoint discrimination"). To do its intended work, of course, the category of content-based regulation triggering strict scrutiny must

sweep more broadly than the actual harm; that category exists to create a buffer zone guaranteeing that the government cannot favor or disfavor certain viewpoints. But that buffer zone need not extend forever. We can administer our content-regulation doctrine with a dose of common sense, so as to leave standing laws that in no way implicate its intended function.

And indeed we have done just that: Our cases have been far less rigid than the majority admits in applying strict scrutiny to facially content-based laws—including in cases just like this one. See *Davenport*, 551 U. S., at 188 (noting that "we have identified numerous situations in which [the] risk" attached to content-based laws is "attenuated"). In *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984), the Court declined to apply strict scrutiny to a municipal ordinance that exempted address numbers and markers commemorating "historical, cultural, or artistic event[s]" from a generally applicable limit on sidewalk signs. *Id.*, at 792, n. 1 (listing exemptions); see *id.*, at 804–810 (upholding ordinance under intermediate scrutiny). After all, we explained, the law's enactment and enforcement revealed "not even a hint of bias or censorship." *Id.*, at 804; see also *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 48 (1986) (applying intermediate scrutiny to a zoning law that facially distinguished among movie theaters based on content because it was "designed to prevent crime, protect the city's retail trade, [and] maintain property values . . . , not to suppress the expression of unpopular views"). And another decision involving a similar law provides an alternative model. In *City of Ladue* v. *Gilleo*, 512 U. S. 43 (1994), the Court assumed *arguendo* that a sign ordinance's exceptions for address signs, safety signs, and for-sale signs in residential areas did not trigger strict scrutiny. See *id.*, at 46–47, and n. 6 (listing exemptions); *id.*, at 53 (noting this assumption). We did not need to, and so did not, decide the

level-of-scrutiny question because the law's breadth made it unconstitutional under any standard.

The majority could easily have taken *Ladue*'s tack here. The Town of Gilbert's defense of its sign ordinance—most notably, the law's distinctions between directional signs and others—does not pass strict scrutiny, or intermediate scrutiny, or even the laugh test. See *ante*, at 14–15 (discussing those distinctions). The Town, for example, provides no reason at all for prohibiting more than four directional signs on a property while placing no limits on the number of other types of signs. See Gilbert, Ariz., Land Development Code, ch. I, §§4.402(J), (P)(2) (2014). Similarly, the Town offers no coherent justification for restricting the size of directional signs to 6 square feet while allowing other signs to reach 20 square feet. See §§4.402(J), (P)(1). The best the Town could come up with at oral argument was that directional signs "need to be smaller because they need to guide travelers along a route." Tr. of Oral Arg. 40. Why exactly a smaller sign better helps travelers get to where they are going is left a mystery. The absence of any sensible basis for these and other distinctions dooms the Town's ordinance under even the intermediate scrutiny that the Court typically applies to "time, place, or manner" speech regulations. Accordingly, there is no need to decide in this case whether strict scrutiny applies to every sign ordinance in every town across this country containing a subject-matter exemption.

I suspect this Court and others will regret the majority's insistence today on answering that question in the affirmative. As the years go by, courts will discover that thousands of towns have such ordinances, many of them "entirely reasonable." *Ante*, at 14. And as the challenges to them mount, courts will have to invalidate one after the other. (This Court may soon find itself a veritable Supreme Board of Sign Review.) And courts will strike down those democratically enacted local laws even though no

one—certainly not the majority—has ever explained why the vindication of First Amendment values requires that result. Because I see no reason why such an easy case calls for us to cast a constitutional pall on reasonable regulations quite unlike the law before us, I concur only in the judgment.