Griffith, Circuit Judge, concurring in part and dissenting in part:
When the government restricts First Amendment freedoms, it "bears the burden of proving the constitutionality of its actions." McCutcheon v. FEC , 572 U.S. 185, 210, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion) (quoting United States v. Playboy Entm't Grp. , 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ). Here, the government has not justified the cromnibus amendments' two-tiered scheme for contributions to national political parties. I therefore part ways with the majority on the second and third certified questions.
The appropriate standard of review is closely drawn scrutiny, as the majority assumes and Judge Katsas explains. See Maj. Op. at 549; Op. at 558-60 (Katsas, J.). Under this standard, the government must "demonstrate[ ] a sufficiently important interest and employ[ ] means closely drawn to avoid unnecessary abridgment" of First Amendment freedoms. Buckley v. Valeo , 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). The only qualifying interest is combating quid pro quo corruption and its appearance, and we require the government to employ "a means narrowly tailored to achieve the desired objective." McCutcheon , 572 U.S. at 192, 218, 134 S.Ct. 1434 (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox , 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ). This standard is "rigorous," and the government will not prevail if there is "a substantial mismatch between [its] stated objective and the means selected to achieve it." Id. at 197, 199, 134 S.Ct. 1434 (first quoting Buckley , 424 U.S. at 29, 96 S.Ct. 612 ).
The Libertarian National Committee (LNC) would take no issue with a single contribution limit set at $ 33,400 or $ 334,000. Maj. Op. at 549. Indeed, a challenge to such a limit would be foreclosed by McConnell v. FEC , 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). There, the Supreme Court held that the Federal Election Campaign Act permissibly prohibited a donor from contributing more than $ 25,000 to a national political party because the government showed that the prohibition substantially advanced, and was properly tailored to, the government's interests in preventing corruption or its appearance. See McConnell , 540 U.S. at 142-61, 124 S.Ct. 619.
But McConnell does not resolve this case, because the two-tiered scheme here differs in important ways from the limit upheld in McConnell . Rather than limiting all contributions above a certain level, the scheme prohibits contributions above the general limit of $ 33,400 but makes exceptions to that general limit by allowing additional contributions of up to $ 100,200 to each of three segregated accounts for presidential nominating conventions, party headquarters, and election recounts and litigation. See 52 U.S.C. § 30116(a)(1)(B), (a)(9) ; Maj. Op. at 536.[1] This is a new *554 scheme. McConnell did not address the propriety of a regime with these exceptions, the presence of which "can raise doubts about whether the government is in fact pursuing the interest it invokes" or "reveal that a law does not actually advance" that interest. Williams-Yulee v. Fla. Bar , --- U.S. ----, 135 S. Ct. 1656, 1668, 191 L.Ed.2d 570 (2015) (internal quotation marks omitted). Put differently, the cromnibus amendments introduced a critical feature not present in McConnell : "Congress' judgment" that contributions of $ 300,600 to segregated accounts "do not unduly imperil anticorruption interests." Davis v. FEC , 554 U.S. 724, 741, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008). Given this judgment by Congress, it is now "hard to imagine how" limiting general contributions to $ 33,400 "serv[es] anticorruption goals sufficiently to justify the resulting constitutional burden"-unless general and segregated contributions differ in a constitutionally meaningful way. Id. For these reasons, the government cannot justify treating general contributions more restrictively than segregated contributions based on McConnell 's approval of a since-abandoned congressional judgment. Rather, the government must show that a new scheme that differentiates between general and segregated contributions is closely drawn to serve anticorruption interests.
To do so, the government argues that general and segregated contributions raise different corruption concerns. This is because general-account spending is more likely to be for the purpose of influencing elections and thus raise corruption concerns, while segregated-account spending is less likely to be for the purpose of influencing elections and thus does not raise comparable corruption concerns. See FEC Br. 46-50. The record does not support this distinction.
The government relies on identical statements from Senator Reid and Representative Boehner, who both asserted that "many" of the expenditures from segregated accounts are "not for the purpose of influencing Federal elections." 160 Cong. Rec. S6814 (daily ed. Dec. 13, 2014); id. at H9286 (daily ed. Dec. 11, 2014). But these self-serving assertions by representatives of the major parties do not tell us whether segregated-account spending is any different from general-account spending with respect to influencing elections or raising corruption concerns. Without that information, we simply do not know whether the cromnibus amendments are justified in prohibiting all contributions above the general limit except those made to segregated accounts. And an ambivalent record is not enough to survive closely drawn scrutiny. See McCutcheon , 572 U.S. at 217, 134 S.Ct. 1434 (rejecting aggregate contribution limits in part because the government did not provide "any real-world examples" that they served anticorruption interests by preventing donors from circumventing the base limits); McConnell , 540 U.S. at 145-154, 124 S.Ct. 619 (upholding limits on soft-money contributions only after identifying extensive evidence connecting the limits to the government's legitimate interests); cf. Turner Broad. Sys., Inc. v. FCC , 512 U.S. 622, 666-67, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (in applying intermediate scrutiny to a speech restriction, explaining that "we cannot determine" whether Congress drew "reasonable inferences based on substantial evidence" without "a more substantial elaboration in the District Court of the predictive or historical evidence upon which Congress relied, or the introduction of some additional evidence");
*555 Annex Books, Inc. v. City of Indianapolis , 581 F.3d 460, 463 (7th Cir. 2009) (Easterbrook, J.) ("[T]here must be evidence " to carry a First Amendment burden.).
The government's position does not fare any better when we examine the segregated accounts more closely. As the majority points out, the higher limits on contributions to pay for presidential nominating conventions were prompted by the end of public funding for such conventions in 2014. The cromnibus amendments gave parties a "tool for making up for that shortfall." Maj. Op. at 550. That explanation is understandable, but it does not establish that there are lesser corruption concerns with contributions that help put on nominating conventions. There can be no serious doubt that the nominating conventions of the major parties are closely connected to elections. Contributions to their staging therefore appear to raise the same corruption risks as general contributions, and the record provides no reason to think otherwise.
The record is similarly slim as to the segregated accounts for maintaining party headquarters and contesting election results. The majority offers that "Congress could have permissibly concluded that unlike contributions that can be used for, say, television ads, billboards, or yard signs, contributions that fund mortgage payments, utility bills, and lawyers' fees have a comparatively minimal impact on a party's ability to persuade voters and win elections." Id. Perhaps, but that inference lacks record support. The record gives no reason to think that spending on party headquarters or election contests has a different influence on elections than general-account spending, and the majority might just as reasonably have said the opposite: that Congress "could have" determined that elections are significantly influenced by a party headquarters (where parties might host donors and connect them to party leaders and candidates) and election recounts and litigation (which resolve whether an actual candidate wins or loses a particular election). My point is not that either of these potential determinations is more reasonable than the other; my point is that without record support they are "too speculative" to carry a First Amendment burden. McCutcheon , 572 U.S. at 210, 134 S.Ct. 1434.
Finally, the factual findings made by the district court provide no better support for the government. The district court found that "unrestricted funds are more valuable to national party committees and their candidates than funds that may only be used for particular categories of expenses." Findings of Fact ("CF") ¶ 50, Libertarian Nat'l Comm. v. FEC , 317 F. Supp. 3d 202 (D.D.C. 2018). And according to the government, "it is simple common sense that the more a political party values a contribution, the more likely that contribution will be or appear to be part of a quid pro quo corruption scheme," making it more reasonable for the cromnibus amendments to treat general contributions more restrictively than segregated contributions. FEC Br. 47. The problem for the government, however, is that the district court's findings simultaneously point in the opposite direction: "A political party may in some circumstances value a contribution with use restrictions more highly than a smaller contribution without such restrictions," particularly because money is generally fungible and every dollar received through segregated accounts "potentially frees up another dollar in the recipient's general account for unrestricted spending." CF ¶¶ 38-39. The record does not clarify whether such a "circumstance" is presented by this case; again, we just don't know. Moreover, even if a dollar donated to a general account raised more corruption concerns than a dollar given to a segregated account, the government acknowledges *556 that "larger contributions to political parties are generally more likely to lead to actual or apparent quid pro quo arrangements and can do so regardless of how the funds are ultimately used." CF ¶ 35 (alterations omitted). This further highlights the poor fit of the cromnibus amendments, which treat larger contributions to segregated accounts as if they were less likely to raise corruption concerns than substantially smaller contributions to a general account.
In the absence of any corruption-related difference between general and segregated contributions, the government has not carried its burden of showing that the two-tiered scheme is closely drawn to serve anticorruption interests. This conclusion does not rely on a "freestanding underinclusiveness limitation," as Judge Katsas fears. Op. at 568 (Katsas, J.) (quoting Williams-Yulee , 135 S. Ct. at 1668 ). Although "the First Amendment imposes no freestanding 'underinclusiveness limitation,' " underinclusivity still "creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way ." Williams-Yulee , 135 S. Ct. at 1668, 1670 (first quoting R.A.V. v. City of St. Paul , 505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ). That's the problem with the two-tiered scheme in this case. On this record, segregated and general contributions affect the government's anticorruption interests in the same way, yet the scheme restricts general contributions while declining to restrict segregated contributions. Thus, the scheme's underinclusiveness-its exceptions allowing some contributions above the general limit-shows that the government has not justified prohibiting other contributions from exceeding the general limit. See id. at 1670 ; see also Reed v. Town of Gilbert , --- U.S. ----, 135 S. Ct. 2218, 2231, 192 L.Ed.2d 236 (2015) (rejecting a speech restriction as "hopelessly underinclusive" under strict scrutiny because it drew distinctions between prohibited and permissible categories of speech in a way that was not justified by the interests asserted by the government); id. at 2239 (Kagan, J., concurring in the judgment) (rejecting the same restriction under intermediate scrutiny due to its underinclusivity); Edwards v. District of Columbia , 755 F.3d 996, 1007-08 (D.C. Cir. 2014) (rejecting a speech restriction as "fatally underinclusive" under intermediate scrutiny).
That is enough to resolve the second and third certified questions in the LNC's favor, but in closing I note that there are additional reasons to be skeptical of the government's position. The two-tiered scheme's exceptions loosen restrictions on the very contributions that are highly sought by major parties but of little use to minor parties. In my view, this further undercuts the government's position that the scheme pursues the only permissible government interest: combating quid pro quo corruption and its appearance.
Under the scheme, a donor may contribute a total of $ 334,000 to a political party: $ 33,400 to the general account and $ 100,200 to each of the three segregated accounts. The major parties benefit from this scheme because they spend substantial sums on activities that can be paid for through segregated accounts: They put on lavish nominating conventions that are spectacles made for a national audience, they maintain expensive headquarters, and they challenge and defend in court the outcomes of numerous elections across the country. Indeed, from December 2014 through December 2016, the Republican Party received more than $ 23 million for its convention, $ 26 million for its headquarters, and $ 5 million for election recounts *557 and litigation; the Democratic Party received more than $ 12 million for its convention, $ 3 million for its headquarters, and $ 6 million for election recounts and litigation. CF ¶¶ 45-46; J.A. 90. The cromnibus amendments enable the major parties to raise such sums with individual contributions of up to $ 334,000. What's more, those contributions are in effect no different from general contributions. So long as a party has segregated-account expenses, a dollar received in a segregated account frees up a dollar in the general account that otherwise might have been used to defray the segregated-account expenses. Therefore, until a party receives enough money to cover its segregated-account expenses, the two-tiered scheme establishes an effective general contribution limit of $ 334,000.
By contrast, minor parties gain little from this scheme because they do not have much use for segregated-account contributions. The LNC, for example, holds more modest conventions and maintains a less expensive headquarters than the major parties, and the LNC has never spent money on election recounts and is unlikely to do so in the future. See LNC Br. 13-15. In most years, its expenses for these purposes are less than $ 500,000. See id. ; CF ¶¶ 25-29. Lacking further segregated-account expenses, the LNC and similar minor parties do not benefit much from the higher limit for segregated-account contributions. Instead, they seek contributions that can be used for other purposes, and those contributions are limited to $ 33,400.
In this way, the scheme's exceptions loosen restrictions on those contributions that are useful to major parties but not to minor parties. Of course, this effect is in part attributable to the various levels of support for different parties and the parties' decisions on how to raise and spend contributions. And as the majority notes, this effect alone does not render the scheme unconstitutional. See Maj. Op. at 551. Even so, it raises further doubts that the scheme is tailored to serve anticorruption interests rather than an impermissible interest, such as disadvantaging minor parties. See Williams-Yulee , 135 S. Ct. at 1668. This concern overlaps with those that motivate comparative-disadvantage cases, see, e.g. , Randall v. Sorrell 548 U.S. 230, 248, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (a statute regulating contributions must not "magnify the advantages of incumbency to the point where [it] put[s] challengers to a significant disadvantage"), but it is not an attempt to raise a comparative-disadvantage claim on the LNC's behalf, Maj. Op. at 551-52. It simply provides further record-based reasons to be skeptical that the two-tiered scheme is tailored to serve anticorruption interests.
Because the government has not carried its burden of showing that the scheme is closely drawn to combat corruption or its appearance, I would hold that the scheme violates the First Amendment. Having reached a different decision on the merits, the majority has no occasion to address the appropriate remedy. I therefore do not reach the issue either.[2] But on the merits *558 of the second and third certified questions, I respectfully dissent.
Katsas, Circuit Judge, with whom Circuit Judge Henderson joins, concurring in part, concurring in the judgment in part, and dissenting in part:
This case involves statutory limits on contributions that individuals may make to political parties. In McConnell v. FEC , 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), the Supreme Court held that these contribution limits are not facially unconstitutional. Here, we consider whether the limits are unconstitutional as applied to contributions made through bequests. We also consider whether the limits became unconstitutional when Congress amended them in 2014.
I
To frame the relevant inquiries, we must first decide the appropriate level of First Amendment scrutiny. The majority reserves this question, ante at 541, 549, but I would decide it.
In 1976, the Supreme Court fixed the level of scrutiny for limits on contributions to candidates for federal elective offices. Those limits "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment" of speech and associational freedoms. Buckley v. Valeo , 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Subsequently, the Court has applied this same level of scrutiny to assess the constitutionality of contribution limits imposed on all kinds of donors and recipients, including candidates for federal and state offices; national, state, and local political parties; and political action committees. See , e.g. , McCutcheon v. FEC , 572 U.S. 185, 196-99, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion); Ariz. Free Enter. Club's Freedom Club PAC v. Bennett , 564 U.S. 721, 734-35, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011) ; Davis v. FEC , 554 U.S. 724, 736-37, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) ; Randall v. Sorrell , 548 U.S. 230, 246-48, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (plurality opinion); McConnell , 540 U.S. at 134-41, 124 S.Ct. 619 ; FEC v. Beaumont , 539 U.S. 146, 161-62, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) ; FEC v. Colo. Republican Fed. Campaign Comm. , 533 U.S. 431, 446-56, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) ; Nixon v. Shrink Mo. Gov't PAC , 528 U.S. 377, 387-88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). For shorthand, this level of scrutiny is now referred to (rather clumsily) as "closely drawn scrutiny."
Despite this long line of precedent, the Federal Election Commission urges us to lower the bar, at least with respect to bequests. The FEC asks us to consider only whether the challenged contribution limits prevent the Libertarian National Committee, which received the bequest at issue here, from "amassing the resources necessary for effective advocacy." The FEC plucks that phrase out of Buckley , which observed that contribution limits "could have a severe impact" if they prevented recipients from amassing such resources. 424 U.S. at 21, 96 S.Ct. 612. The FEC reasons that bequests implicate neither the donor's speech interests nor anyone's associational interests, and the recipient's speech interests are impaired only if it is prevented from mounting, in the aggregate, some quantum of "effective" advocacy.
This analysis is flawed at every turn. To begin, "effective advocacy" is not a reduced, free-floating level of First Amendment scrutiny. If a contribution *559 limit prevents effective advocacy, then it is insufficiently tailored to satisfy closely drawn scrutiny. See Randall , 548 U.S. at 246-62, 126 S.Ct. 2479 (plurality opinion); id. at 267-73, 126 S.Ct. 2479 (Thomas, J., concurring in the judgment). But contribution limits may be insufficiently tailored for other reasons, such as "a substantial mismatch between the Government's stated objective and the means selected to achieve it." McCutcheon , 572 U.S. at 199, 134 S.Ct. 1434 (plurality opinion). And regardless of any tailoring problems, contribution limits are unconstitutional if the asserted government interest is insufficiently important. See , e.g. , Davis , 554 U.S. at 740 n.7, 128 S.Ct. 2759 ; SpeechNow.org v. FEC , 599 F.3d 686, 695 (D.C. Cir. 2010) (en banc).
Likewise, the Supreme Court has never attempted "to parse distinctions between the speech and association standards of scrutiny for contribution limits." Shrink Mo. Gov't , 528 U.S. at 388, 120 S.Ct. 897. Rather, it has fashioned what the majority aptly describes as a "single unified test that applies an intermediate level of scrutiny to contribution limits." Ante at 541. Thus, in reaffirming the appropriateness of closely drawn scrutiny in McConnell , the Court held it immaterial that the challenged provisions restricted the acceptance of contributions by parties rather than the giving of contributions by donors. See 540 U.S. at 138, 124 S.Ct. 619. Applying closely drawn scrutiny in SpeechNow , this Court held that the challenged contribution limits violated the First Amendment rights of both the donors and the recipient, without hinting at any distinction between the two. See 599 F.3d at 690-96. And the three-judge district court in Republican National Committee v. FEC , 698 F. Supp. 2d 150 (D.D.C.) (Kavanaugh, J.), aff'd , 561 U.S. 1040, 130 S.Ct. 3544, 177 L.Ed.2d 1119 (2010) (mem.), applied closely drawn scrutiny to assess contribution limits challenged only by recipients. See id. at 153, 156. Of course, different contribution limits may impact speech and associational interests in different ways, but "we account for [those impacts] in the application, rather than the choice, of the appropriate level of scrutiny." McConnell , 540 U.S. at 141, 124 S.Ct. 619.
The FEC's plea for less-than-intermediate scrutiny is also radical. For over four decades, various justices have urged that because contribution limits "operate in an area of the most fundamental First Amendment activities," Buckley , 424 U.S. at 14, 96 S.Ct. 612, they should be subjected to strict rather than closely drawn scrutiny. See , e.g. , Shrink Mo. Gov't , 528 U.S. at 405-10, 120 S.Ct. 897 (Kennedy, J., dissenting); id. at 410-30, 120 S.Ct. 897 (Thomas, J., joined by Scalia, J., dissenting); Colo. Republican Fed. Campaign Comm. v. FEC , 518 U.S. 604, 635-44, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) ( Colorado I ) (Thomas, J., dissenting in part); Buckley , 424 U.S. at 241-46, 96 S.Ct. 612 (Burger, C.J., dissenting in part); id. at 290, 96 S.Ct. 612 (Blackmun, J., dissenting in part). McConnell acknowledged this "significant criticism." 540 U.S. at 137, 124 S.Ct. 619. And in McCutcheon -the Court's most recent decision in this area-the plurality sought to minimize the differences between strict and closely drawn scrutiny, see 572 U.S. at 196-99, 134 S.Ct. 1434, in the face of a continuing call for strict scrutiny, see id. at 228-32, 134 S.Ct. 1434 (Thomas, J., concurring in the judgment). Given this longstanding debate over whether closely drawn scrutiny sets the bar too low, it is quite a stretch to posit that, here, it sets the bar too high.
The FEC's proposal would create anomalies in First Amendment law more generally. Effective speech often requires multiple parties-speakers, listeners, and, in *560 the context of mass markets, patrons. The Supreme Court generally treats the rights of these parties as "reciprocal." Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc. , 425 U.S. 748, 756-57, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("the protection afforded is to the communication, to its source and to its recipients both"). So, the right of one party to speak implies the right of another party to listen. See id. Likewise, the right of one party to fund speech implies the right of another party to accept the funds. Cf. McConnell , 540 U.S. at 138, 124 S.Ct. 619 ("it is irrelevant that Congress chose ... to regulate contributions on the demand rather than the supply side"). It would be odd enough to isolate one from the other in deciding the merits, much less to do so in fixing an appropriate level of scrutiny.
Finally, in fixing the level of scrutiny, death should make no difference. Of course, living donors have substantial speech and associational interests in contributing money to political parties of their choice. See , e.g. , McCutcheon , 572 U.S. at 191-92, 134 S.Ct. 1434 (plurality opinion); id. at 228, 134 S.Ct. 1434 (Thomas, J., concurring in the judgment). Yet a contribution is no less speech and expressive association if the donor makes it through a bequest rather than a lifetime transfer. Either way, the donor intends to support the political views of the party, and an observer would reasonably understand as much. See Buckley , 424 U.S. at 16-17, 96 S.Ct. 612 ; cf. Spence v. Washington , 418 U.S. 405, 410-11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam). Likewise, the speech and associational interests of recipients-in using all available resources to fund political speech-do not vary depending on whether contributions come from living or deceased donors.
In sum, the FEC's attempt to ratchet down the level of scrutiny by separating speech from expressive association, donors from recipients, and the living from the dead is unsupported by precedent and unsound in principle. I would hold what the majority only assumes-that closely drawn scrutiny governs this case.
II
Under closely drawn scrutiny, limits on political contributions are constitutional "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment" of speech and associational freedoms. Buckley , 424 U.S. at 25, 96 S.Ct. 612. In this sensitive area, the only sufficiently important government interests are the prevention of quid pro quo corruption-"a direct exchange of an official act for money"-and its appearance. McCutcheon , 572 U.S. at 192, 134 S.Ct. 1434 (plurality opinion). Interests in equalizing "electoral opportunities," and in preventing donors from acquiring "influence over or access to elected officials or political parties," are insufficient. Id. at 207-08, 134 S.Ct. 1434 (quotation marks omitted). Moreover, "the Government bears the burden of proving the constitutionality of its actions," id. at 210, 134 S.Ct. 1434 (quotation marks omitted), consistent with how intermediate scrutiny works in other First Amendment contexts. See , e.g. , United States v. Nat'l Treasury Emps. Union , 513 U.S. 454, 475, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("the Government ... must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way" (quotation marks omitted)) (speech restrictions on government employees); Turner Broad. Sys., Inc. v. FCC , 512 U.S. 622, 664-68, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion) (same for content-neutral *561 speech restrictions); Edenfield v. Fane , 507 U.S. 761, 770-71, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (same for commercial speech restrictions).
In Buckley , the Supreme Court applied these principles to reject a facial challenge to limits on contributions made to candidates for federal elective offices. The Court noted "deeply disturbing examples" of "quid pro quo " corruption, which proved that the government's asserted interest was "not an illusory one." 424 U.S. at 26-27, 96 S.Ct. 612. The Court cited "a number of the abuses" discussed in our Buckley opinion, id. at 27 n.28, 96 S.Ct. 612, which explained that the record before Congress was "replete with specific examples of improper attempts to obtain governmental favor in return for large campaign contributions," 519 F.2d 821, 839 n.37 (D.C. Cir. 1975) (en banc). The Supreme Court further reasoned that, even if most contributors do not improperly seek quid pro quo exchanges, "suspect contributions" are "difficult to isolate." 424 U.S. at 30, 96 S.Ct. 612. So, to prevent actual and apparent corruption, the government may eliminate the "opportunity for abuse" from large contributions. Id.
In McConnell , the Court rejected a facial challenge to limits on contributions to political parties. Given what it described as the "unity of interest" between parties and elected officials, the Court found "neither novel nor implausible" the supposition that large contributions to a party could corrupt its elected officials. 540 U.S. at 144-45, 124 S.Ct. 619. The Court also discussed at length the supporting evidence: the major political parties annually had been raising hundreds of millions of dollars in previously unregulated soft money, id. at 124, 124 S.Ct. 619 ; these contributions often were solicited by, and used to help, individual candidates, id. at 146, 124 S.Ct. 619 ; wealthy donors made large contributions to both major parties, id. at 148, 124 S.Ct. 619 ; and these contributions impacted a wide range of legislation, id. at 150, 124 S.Ct. 619.
III
A
This case presents a challenge to limits on contributions to political parties made through bequests. In a prior case, the LNC unsuccessfully sought to enjoin application of the contribution limits to all bequests. Libertarian Nat'l Comm., Inc. v. FEC , 930 F. Supp. 2d 154 (D.D.C. 2013) ( LNC I ). Here, the LNC seeks to enjoin application of the limits only to a bequest made by Joseph Shaber.
The facts surrounding this bequest are undisputed. Shaber neither coordinated with the LNC regarding his decision to include the party in his will nor even informed the party of that decision. Libertarian Nat'l Comm., Inc. v. FEC , 317 F. Supp. 3d 202, 249 (D.D.C. 2018) ( LNC II ). "Aside from pursuing its ideological and political mission, the LNC has provided nothing of value to Mr. Shaber, or to anyone else, in exchange for his bequest." Id. at 251. The bequest imposed no conditions and made no requests, but instead provided for the LNC to take "outright" a contribution ultimately valued at about $ 235,000. Id. at 250 (quotation marks omitted). Over the course of his lifetime, Shaber donated a total of $ 3,315 to the LNC, made in 46 separate gifts spread out over 24 years. Id. at 248-49. Besides making these contributions, Shaber had no other relationship with the LNC. Id. at 251.
In its prior cases on contribution limits, the Supreme Court considered no issues specific to bequests. Because the LNC does not rest its claim on "the same factual and legal arguments the Supreme Court expressly considered" in Buckley and *562 McConnell , those precedents do not foreclose the LNC's as-applied challenge here. Republican Nat'l Comm ., 698 F. Supp. 2d at 157 (" McConnell permits as-applied challenges"); see also Doe v. Reed , 561 U.S. 186, 201, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010) ("upholding the law against a broad-based challenge does not foreclose a litigant's success in a narrower one"). Indeed, the Supreme Court has sustained an as-applied challenge to corporate-expenditure limits previously held facially constitutional, FEC v. Wis. Right to Life, Inc. , 551 U.S. 449, 476-82, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) ( WRTL ) (plurality opinion), and this Court has sustained an as-applied challenge to contribution limits previously held facially constitutional, SpeechNow , 599 F.3d at 692-96. Moreover, because the LNC's challenge raises issues not addressed in Buckley or McConnell , the government retains its burden of proof under heightened scrutiny. See WRTL , 551 U.S. at 464-65, 127 S.Ct. 2652 (plurality opinion). Of course, we must determine which facts, if any, distinguish this case from Buckley and McConnell , and the breadth of our reasoning will impact the law going forward. See Citizens United v. FEC , 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) ("no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as applied' cases" (quotation marks omitted)). But regardless of the breadth of our reasoning, the LNC's first claim seeks relief only as to Shaber's individual bequest.
Under these rules for assessing as-applied challenges, I would hold that the challenged contribution limits are unconstitutional as applied to any of three nested categories: bequests, uncoordinated bequests, and Shaber's bequest. I will address the categories from broadest to narrowest.
1
"The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." McConnell , 540 U.S. at 144, 124 S.Ct. 619 (quotation marks omitted). Here, that means requiring more evidence rather than less, for there are strong reasons to think that bequests-in contrast to contributions from living donors-do not pose a significant risk of actual or apparent quid pro quo corruption. For one thing, politics operates on notoriously "short timeframes," Citizens United , 558 U.S. at 334, 130 S.Ct. 876, so gifts deferred until death-perhaps many election cycles down the road-will have relatively little value to political parties or their candidates. For another, there is no easy means for deceased donors or their beneficiaries to enforce any corrupt bargains. In the context of contributions from living donors, such bargains are managed through winks and nods over time, as money flows one way and political favors flow the other. See McConnell , 540 U.S. at 147, 124 S.Ct. 619 (quoting lobbyist's testimony that "overt words are rarely exchanged about contributions, but people do have understandings"). Bequests cannot work like that, because the money flows only once, and at death. So, if a corrupt donor seeks political favors during his lifetime, when the bequest is nothing more than a revocable promise, the recipient will have no way to prevent the donor from accepting the favors but then reneging on the promise. Or, if the donor seeks favors for survivors, he will have no way to ensure delivery after death makes the bequest irrevocable and removes him from the picture. Either way, inherent constraints limit the feasibility of any contemplated exchange. Bequests are thus generally "less susceptible ... to misuse,"
*563 Beaumont , 539 U.S. at 160, 123 S.Ct. 2200, than contributions from living donors.
The evidence confirms this point. To justify its concerns about possible corruption through bequests, the FEC could have pointed to anything in any of four records: the legislative record of a select committee established by Congress to investigate fundraising for the 1972 presidential election, see Buckley , 519 F.2d at 839 n.35 ; the 100,000-page record compiled for the three-judge district court in McConnell , see 251 F. Supp. 2d 176, 209 (D.D.C. 2003) ; the district-court record in LNC I , where all bequests were at issue; or the district-court record in this case. Yet, despite the massive records in Buckley and McConnell , and the two records made in the bequest-specific LNC cases, the FEC points to nothing substantiating its concerns. In fact, these records undercut its position in three critical respects.
First , bequests are rarely used for political contributions. From 1978 through August 2017, bequests accounted for only about $ 3.7 million in contributions to federal candidates, political parties, and all other entities required to file reports with the FEC. LNC II , 317 F. Supp. 3d at 247. To put that number in perspective, the same group of recipients spent $ 7 billion in the 2012 election cycle alone, McCutcheon , 572 U.S. at 219, 134 S.Ct. 1434 (plurality opinion), and the major political parties spent nearly $ 1.2 billion in 2000 alone, see McConnell , 540 U.S. at 124, 124 S.Ct. 619. Of course, bequests to political parties might increase if the relevant contribution limits were invalidated. But, from 1978 to 2002, donors could have made unlimited soft-money bequests to political parties. See id. at 122-24, 124 S.Ct. 619. And if McConnell correctly understood the "unity of interest" between political parties and elected officials, such bequests would have been almost as enticing as ones made directly to the officials. See id. at 144-45, 124 S.Ct. 619. In sum, despite decades of little or no relevant regulation, contributions through bequests have remained a drop in the proverbial bucket.
Second , and perhaps most striking, the FEC does not point to even a single quid pro quo exchange-at any time in American history-allegedly effected through a bequest. Nor do the careful, extensive findings made by the district courts in the LNC cases. See LNC I , 930 F. Supp. 2d at 171-90 ; LNC II , 317 F. Supp. 3d at 225-57. In developing the records for those cases, all the FEC could muster up was more evidence of corruption involving contributions from living donors. See id. at 236-42. In striking down limits on independent expenditures by corporations, the Supreme Court stressed that "[t]he McConnell record was over 100,000 pages long, yet it does not have any direct examples of votes being exchanged for expenditures." Citizens United , 558 U.S. at 360, 130 S.Ct. 876 (cleaned up). The FEC's failure of proof here is no less dramatic.
Third , there is no evidence of testators trying to play both sides. In McConnell , the Court found it "[p]articularly telling" that wealthy individuals "gave substantial sums to both major national parties, leaving room for no other conclusion but that these donors were seeking influence, or avoiding retaliation, rather than promoting any particular ideology." 540 U.S. at 148, 124 S.Ct. 619. The FEC alleges nothing comparable as to bequests. This should hardly be surprising, for the possibility of a corrupt donor securing political favors, not by giving large sums to both parties during his lifetime, but by simultaneously remembering both parties in his will, seems almost fantastic.
Against this evidence (or lack thereof), and despite the practical problems with effectuating any quid pro quo through a *564 bequest, the majority posits that a corrupt bequest might be possible-in theory-if the donor and the party worked out the exchange in advance. Ante at 541-42. With respect, I find that possibility insufficient to discharge the FEC's significant burden of proof under closely drawn scrutiny. The Supreme Court has " 'never accepted mere conjecture as adequate to carry a First Amendment burden,' " McCutcheon , 572 U.S. at 210, 134 S.Ct. 1434 (plurality opinion) (quoting Shrink Mo. Gov't , 528 U.S. at 392, 120 S.Ct. 897 ), and so neither should we.
2
In any event, contribution limits are unconstitutional as applied to uncoordinated bequests. To reiterate, the majority posits that bequests could be corrupt if the testator bargained with the intended beneficiary before his death. Ante at 541-42; see also LNC I , 930 F. Supp. 2d at 166 ("making one's bequest known before death could be treated just as a contribution is"). But this cannot happen if the testator does not even tell the recipient about the planned bequest during his lifetime. In that circumstance, a quid pro quo exchange is impossible.
The only response is that coordinated and uncoordinated bequests may be difficult to distinguish, so both must be regulated together. But this reasoning runs counter to perhaps the most fundamental distinction in campaign-finance law-between contributions and independent expenditures.
In Buckley , the Court invalidated a limit on the expenditures that any person could make "relative to a clearly identified candidate." See 424 U.S. at 39-51, 96 S.Ct. 612 (quotation marks omitted). The government defended the expenditure limit as necessary to prevent evasion of the limits on contributions to candidates. But the governing statute already treated "controlled or coordinated expenditures" as "contributions rather than expenditures." Id. at 46 & n.53, 96 S.Ct. 612. And the Court held that this distinction between coordinated and independent spending also marked a critical constitutional line. Thus, the treatment of "prearranged or coordinated expenditures" as contributions permissibly addressed the government's concern about evading contribution limits. Id. at 47, 96 S.Ct. 612. But the limit on independent expenditures did not. As the Court explained: "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." Id. Later decisions have reinforced this "fundamental constitutional difference" between independent expenditures, which are fully protected, and coordinated expenditures, which may be and are regulated as contributions. FEC v. Nat'l Conservative Political Action Comm. , 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ; see , e.g. , McConnell , 540 U.S. at 202-03, 219-22, 124 S.Ct. 619 ; Colorado I , 518 U.S. at 613-16, 116 S.Ct. 2309 (plurality opinion); FEC v. Mass. Citizens for Life, Inc. , 479 U.S. 238, 251-63, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). Most recently, in Citizens United , the Court applied this reasoning to invalidate limits on independent expenditures by corporations and unions. 558 U.S. at 356-60, 365-66, 130 S.Ct. 876.
In SpeechNow , this Court recognized that the protection for independent expenditures also constrains the government's ability to regulate contributions. We held that contribution limits are unconstitutional as applied to recipients that engage only in independent expenditures. We noted *565 that, after Citizens United , "the government has no anti-corruption interest in limiting independent expenditures." 599 F.3d at 693. Then, we reasoned: "In light of the Court's holding as a matter of law that independent expenditures do not corrupt or create the appearance of quid pro quo corruption, contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption." Id. at 694. Because no legitimate government interest was implicated, even a modest impairment of speech and associational rights would be unconstitutional. See id. at 695 ("something ... outweighs nothing every time" (quotation marks omitted)).
The line between coordinated and uncoordinated spending thus runs throughout campaign-finance law, and the FEC routinely must police it. Congress has long defined an expenditure "independent" of a candidate as one that, in pertinent part, was "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." 52 U.S.C. § 30101(17)(B) ; see also id. § 30116(a)(7)(B)(i) (treating expenditures not independent of a candidate as "a contribution to such candidate"); McConnell , 540 U.S. at 221-22 & n.99, 124 S.Ct. 619. A parallel definition now distinguishes expenditures "independent" of political parties from contributions to those parties. See id. at 219-20 & n.97, 124 S.Ct. 619. The Supreme Court has held that this definition is not impermissibly vague, id. at 222-23, 124 S.Ct. 619 ; the FEC has promulgated a swath of regulations implementing it, see generally 11 C.F.R. pt. 109; and the Commission or the courts frequently apply it to determine whether disputed expenditures were in fact independent, see , e.g. , Colorado I , 518 U.S. at 619-23, 116 S.Ct. 2309 (plurality opinion); AFL-CIO v. FEC , 333 F.3d 168, 171 (D.C. Cir. 2003). Likewise, other decisions assess whether specific entities make only independent expenditures and thus have a First Amendment right to receive unrestricted contributions under SpeechNow . See , e.g. , Vt. Right to Life Comm., Inc. v. Sorrell , 758 F.3d 118, 140-41 (2d Cir. 2014).
Armed with extensive disclosure requirements and enforcement powers, the FEC routinely determines whether disputed expenditures were coordinated or independent. The FEC offers no reason why it cannot make the same determination as to bequests. Because coordinated and uncoordinated bequests can be manageably distinguished, and because uncoordinated bequests are not even alleged to present any corruption risk, the contribution limits are unconstitutional at least as applied to them.
3
Finally, the contribution limits are unconstitutional as applied to Shaber's individual bequest. Not only was his bequest uncoordinated, but several additional facts make the LNC's challenge even stronger.
First , far from coordinating with the LNC, Shaber never even told the LNC of the bequest before his death. LNC II , 317 F. Supp. 3d at 249. With the LNC unaware that a testamentary quid might be forthcoming, there could be no quid pro quo agreement-nor even any debate about whether to infer such an agreement based on winks, implicit understandings, or other ambiguous circumstances.
Second , the bequest came with no strings attached. LNC II , 317 F. Supp. 3d at 250. It neither demanded nor even asked that the LNC do anything in return. The district court noted that, in one other instance, a trustee had requested that the LNC use the bequest to help defeat specific *566 candidates. See id. at 248. There would be nothing wrong with such an agreement, for that quo would not involve any "official act" of the government. See McCutcheon , 572 U.S. at 192, 134 S.Ct. 1434 (plurality opinion). But, here, Shaber never sought any quo at all.
Third , the LNC "provided nothing of value" in exchange for the bequest, except perhaps for continuing to "pursu[e] its ideological and political mission." LNC II , 317 F. Supp. 3d at 251. In LNC I , the FEC expressed concern that a political party could grant "preferential access" to testators who (unlike Shaber) tell the party of the intended gift during their lifetime. 930 F. Supp. 2d at 186. However, "[i]ngratiation and access ... are not corruption." Citizens United , 558 U.S. at 360, 130 S.Ct. 876. And, here, Shaber did not seek even that.
Fourth , Shaber made only modest contributions to the LNC during his lifetime. As the district court explained, Shaber's total lifetime donation of $ 3,315, made in 46 separate contributions spread out over 24 years, "is a drop in the bucket relative to current law's annual limit of $ 33,900 for individuals to contribute for any purpose to national political party committees, and an even smaller drop relative to the limit of $ 339,000 that individuals may contribute for either general or specialized purposes." LNC II , 317 F. Supp. 3d at 216. Likewise, Shaber's contribution history did not qualify him for any of the benefits that the LNC affords to its major donors. See id. at 242. So, there is no reason to think that the LNC might have even identified Shaber as someone likely to make a large bequest, much less used that possibility to engineer a secret quid pro quo before his death.
Finally , besides making his modest gifts, Shaber had no other relationship with the LNC during his lifetime, LNC II , 317 F. Supp. 3d at 251, thus making the prospect of corruption even more unlikely.
B
The majority views the LNC's as-applied claim as resting on nothing more than a factual contention that Shaber's individual bequest was not corrupt. Ante at 542-43. It then rejects the claim as inconsistent with Buckley 's holding that, because corrupt and legitimate contributions are hard to distinguish, "prophylactic" limits may be applied to both. Ante at 543-44 (quotation marks omitted). But there is more to the LNC's claim.
As noted above, the fact that the LNC sought relief only as to Shaber's bequest did not prevent it from making substantive arguments that sweep more broadly. See Bucklew v. Precythe , --- U.S. ----, 139 S. Ct. 1112, 1127-28, --- L.Ed.2d ---- (2019) ; Citizens United , 558 U.S. at 331, 130 S.Ct. 876. Although the LNC asks us to assess Shaber's bequest based on a totality of the circumstances, it also makes broader arguments keyed to the general nature of bequests and uncoordinated bequests. See , e.g. , LNC Opening Br. at 37 ("[B]arring supernatural intervention, the potential for quid pro quo activity is rather more limited than in the case of a living donor, as are prospects for its enforcement. Regardless of what the LNC might do for Shaber now, he will give it nothing more or less than his bequest."); LNC Reply Br. at 14 ("Bequests are different. Until death, they are merely a revocable promise. After death, they are irrevocable, and cannot be policed by the dead for quid pro quo compliance."). In my judgment, that was enough to preserve the broader arguments-and, as to them, to trigger the FEC's burden of proof under closely drawn scrutiny. The FEC did not misapprehend this point; to the contrary, it argued both that Buckley *567 forecloses as-applied challenges based on the facts of individual cases, FEC Br. at 25-28, and that bequests as a category raise the same corruption concerns as other kinds of political contributions, id. at 29-32.
On the merits, the LNC's substantive arguments do not threaten the general justification for prophylactic contribution limits. As explained above, contributions made through bequests may be safely distinguished as a category-just like contributions to groups that make only independent expenditures. See SpeechNow , 599 F.3d at 692-96. The same is true for the narrower category of contributions made through uncoordinated bequests. And to the extent that additional facts strengthen the LNC's challenge, there is nothing inappropriate about considering them. Successful as-applied challenges often turn on the facts of individual cases. See , e.g. , WRTL , 551 U.S. at 469-81, 127 S.Ct. 2652 (plurality opinion) (expenditure limit impermissibly extended beyond functional equivalent of express advocacy); Brown v. Socialist Workers '74 Campaign Comm. , 459 U.S. 87, 88, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (disclosure requirement impermissibly subjected party to threats or harassment). Likewise, case-specific facts would be necessary to determine whether contribution limits prevent individual recipients from "amassing the resources necessary for effective advocacy"-a type of as-applied challenge that McConnell repeatedly invited. 540 U.S. at 159, 124 S.Ct. 619 (quotation marks omitted); see id. at 173, 124 S.Ct. 619.
The majority also suggests that as-applied challenges to contribution limits may be appropriate in cases where the burdens imposed on speakers are particularly harsh, but not in cases where the relevant government interests are particularly weak. Ante at 544-45. There is no conceptual reason why that should be so, for closely drawn scrutiny requires proof both that an important government interest is implicated and that the challenged restriction does not infringe speech or associational interests unnecessarily. SpeechNow confirms this point. There, in striking down contribution limits as applied to recipients that make only independent expenditures, we rested squarely on the premise that "the government ha[d] no anticorruption interest" in that case, without reaching the question of how severely the challenged limits infringed speech and associational interests. 599 F.3d at 694-95.
Finally, it is worth remembering that Buckley and McConnell are themselves exceptions to an overarching First Amendment principle. "Broad prophylactic rules in the area of free expression are suspect," and "[p]recision of regulation must be the touchstone" in this area. NAACP v. Button , 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Buckley and McConnell qualify that principle, by approving "prophylactic" restrictions extending to some non-corrupt contributions. McCutcheon , 572 U.S. at 221, 134 S.Ct. 1434 (plurality opinion). But the "prophylaxis" must also have limits. See id. Under closely drawn scrutiny, it cannot properly be extended to bequests that, as a group and individually, may reliably be determined to be legitimate.
IV
Beyond any question about bequests, the LNC challenges the contribution limits as amended in 2014. The LNC contends that the current limits are unconstitutional, both on their face and as applied. On this point, the LNC does not highlight any facts about Shaber's individual contribution, but instead attacks the statutory scheme itself.
*568 The provisions at issue are structured as one old rule subject to three new exceptions. The rule is that no person may contribute over $ 25,000 per year to a national political party, 52 U.S.C. § 30116(a)(1)(B), subject to adjustment for inflation, id . § 30116(c). It is contained in the Federal Election Campaign Act of 1971 (FECA), as amended by the Bipartisan Campaign Finance Reform Act of 2002 (BCRA), and it was upheld by McConnell . See Pub. L. No. 107-155, § 307(a)(2), (d), 116 Stat. 81, 102-03; 540 U.S. at 142-61, 124 S.Ct. 619. The exceptions permit individuals to make additional annual contributions of up to $ 75,000 for presidential nominating conventions, $ 75,000 for party headquarters, and $ 75,000 for recounts and other legal proceedings, all subject to the same inflation adjustment. 52 U.S.C. § 30116(a)(1)(B), (a)(9). They were created by a 2014 amendment to FECA. Pub. L. No. 113-235, div. N, § 101, 128 Stat. 2130, 2772-73. The LNC's challenge to this scheme mixes attacks on the new exceptions, attacks on the old rule, and attacks on how the two treat different categories of speech differently. The LNC also combines arguments based on overbreadth and underbreadth. But once these various arguments are unpacked, none of them succeeds.
Most obviously, the new contribution limits do not themselves restrict too much speech. On this point, McConnell controls. If a prohibition on contributing more than $ 25,000 to a political party for any purpose does not restrict too much speech, then neither do exceptions that permit additional contributions of up to three times that amount. The majority correctly concludes that this much is a matter of "simple mathematics," ante at 545, and Judge Griffith agrees, ante at 535.
The LNC further attacks the statutory distinction between contributions for nominating conventions, headquarters, and legal proceedings (now governed by the higher 2014 limits) and contributions for all other purposes (still governed by the lower BCRA limit). It contends that there is no anti-corruption justification for treating these categories differently. The majority concludes that there are such justifications, ante at 550-51, while Judge Griffith concludes that there may not be, ante at 536-38. In my view, Judge Griffith has the better of this argument, so I would join his dissent if the First Amendment required proof of a corruption-based justification for the differential treatment of these speech categories. But I do not think that such proof is necessary in this case.
As a general matter, "the First Amendment imposes no freestanding 'underinclusiveness limitation.' " Williams-Yulee v. Fla. Bar , --- U.S. ----, 135 S. Ct. 1656, 1668, 191 L.Ed.2d 570 (2015) (quoting R.A.V. v. City of St. Paul , 505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ). So, for example, if a state may prohibit obscenity across the board, then it may prohibit obscene telephone calls but not obscene telegrams-even if the two raise comparable concerns. See R.A.V. , 505 U.S. at 387, 112 S.Ct. 2538. Otherwise, laws might "violate[ ] the First Amendment by abridging too little speech"-which is highly "counterintuitive." Williams-Yulee , 135 S. Ct. at 1668.
In my view, that principle governs this case. Under closely drawn scrutiny, Congress needed an anti-corruption justification both to impose BCRA's original contribution limit and to limit the additional categories of spending permitted by the 2014 amendment. As noted above, McConnell found sufficient justification for the former, and the latter follows from it. But Congress did not need a further, corruption-related justification to restrict contributions *569 for nominating conventions, headquarters, and legal expenses less severely than it restricts other contributions. Rather, Congress could have chosen to restrict those contributions less severely for other reasons, such as a desire to make up for the loss of public funds for nominating conventions, or simply to permit more speech rather than less. The First Amendment demands a strong anti-corruption justification when Congress chooses to restrict campaign contributions, not when it chooses to loosen the restrictions.
There are two important qualifications to this analysis, but neither affects the bottom line here.
First , distinctions among categories of speech may violate the First Amendment if they are based on content. See R.A.V. , 505 U.S. at 387, 112 S.Ct. 2538 ("the First Amendment imposes not an 'underinclusiveness' limitation but a 'content discrimination' limitation"). Here, the LNC contends that the more favorable treatment of contributions for nominating conventions, headquarters, and legal expenses is content-based, because it targets speech based on its "function or purpose." Reed v. Town of Gilbert , --- U.S. ----, 135 S. Ct. 2218, 2227, 192 L.Ed.2d 236 (2015). Moreover, if a distinction between "political" and other speech is content-based, see id. at 2224-30, then so are the distinctions among the types of political-speech contributions at issue here.
Whatever the force of this argument in the abstract, it cannot carry the day. Reed did not involve campaign contribution limits, which the Supreme Court has long treated as content-neutral restrictions subject to intermediate scrutiny. So, while I disagree with the majority's suggestion that Reed is inapposite because this case does not involve speech restrictions, ante at 548, I agree with its ultimate conclusion, ante at 548-49, that a lower court cannot follow the implications of Reed as against the holdings of the campaign-finance cases. See Agostini v. Felton , 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).
Second , underinclusiveness can raise First Amendment concerns for another reason, by suggesting that the government is not pursuing its asserted interests or that the challenged speech restriction will not substantially advance them. See Williams-Yulee , 135 S. Ct. at 1668. The majority concludes that the 2014 scheme does not raise these concerns, ante at 550-51, while Judge Griffith concludes that it does, ante at 554-47. Were we free to engage this question, I would agree with Judge Griffith. But I believe that McConnell forecloses the debate.
An underinclusiveness argument along these lines uses speech-enabling exceptions to attack a speech-restricting rule. If the government allows the sale of violent movies, that casts doubt on its asserted need to restrict the sale of violent video games. Brown v. Entm't Merchs. Ass'n , 564 U.S. 786, 801-02, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). If the government permits newspapers to be distributed through newsracks, that casts doubt on its asserted need to prohibit commercial publications from being similarly distributed. City of Cincinnati v. Discovery Network, Inc. , 507 U.S. 410, 416-28, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). If the government permits electronic media to release names of juvenile offenders, that casts doubt on its asserted need to prohibit newspapers from doing so. Smith v. Daily Mail Publ'g Co. , 443 U.S. 97, 104-05, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979).
Here, the analogous argument amounts to a direct attack on BCRA itself: If Congress permits annual contributions to political parties of $ 225,000 (or $ 300,600, adjusted for inflation) for three specified *570 categories of activity, that casts doubt on its asserted need to prohibit all other annual contributions over $ 25,000 (or $ 33,400, adjusted for inflation). As Judge Griffith explains, the argument is compelling: money is fungible, the exceptions dwarf the rule, and there is no plausible anti-corruption rationale to explain the disparate treatment. Nonetheless, McConnell held that BCRA's $ 25,000 contribution limit substantially advances, and is narrowly tailored to, the important government interest in combatting actual or apparent quid pro quo corruption. If we may not revisit that conclusion based on intervening Supreme Court decisions that undermine McConnell 's reasoning, see Agostini , 521 U.S. at 237, 117 S.Ct. 1997, then neither may we revisit it based on intervening statutes that do likewise. On this point, any course correction must come from the Supreme Court itself.
Judge Griffith concludes that McConnell is not binding on this point because it did not involve a "regime" with the three new exceptions. Ante at 553. True enough, but the upshot of his argument is that "limiting general contributions to $ 33,400" is now unconstitutional. Id. And that general limit, created by section 307(a)(2) of BCRA, and currently codified at 52 U.S.C. § 30116(a)(1)(B), is precisely the one that McConnell upheld.
* * * *
I join Part II of the majority opinion, which holds that the LNC has standing to raise its various challenges. For the reasons given above, I respectfully dissent from Part III of the opinion, and I concur in the judgment as to Part IV.

Like the majority, I use the limits adjusted for inflation as of 2015. Maj. Op. at 536.

The appropriate remedy, i.e. , the "upshot" of holding that the scheme violates the First Amendment, Op. at 570 (Katsas, J.), is disputed by the parties. The LNC argues that the appropriate remedy is excising the use restrictions while leaving the increased overall limit, allowing a donor to contribute $ 334,000 for general use. LNC Br. 62-63; accord Amicus Br. of the Goldwater Inst. 8. The government urges the pre-cromnibus status quo, which would allow a donor to contribute $ 33,400 for general use and nothing more. FEC Br. 54-56. Alternatively, the court could remand this matter for further record development. See Order, Holmes v. FEC , No. 14-5281 (D.C. Cir. Jan. 30, 2015) (en banc) (per curiam); Buckley v. Valeo , 519 F.2d 817, 818 (D.C. Cir. 1975) (en banc) (per curiam); see also Turner , 512 U.S. at 668, 114 S.Ct. 2445.